### The PEOPLE of the State of Colorado, Petitioner,

v.

### Jason T. NORTON, Respondent.

### No. 02SC91.

Supreme Court of Colorado,
En Banc.

Jan. 21, 2003.

Rehearing Denied Feb. 24, 2003.*

---

* Justice MARTINEZ and justice BENDER would     grant the Petition.

Ken Salazar, Attorney General, John D. Seidel, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Petitioner.

David S. Kaplan, Colorado State Public Defender, Elisabeth Hunt White, Deputy State Public Defender, Denver, Colorado, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

We granted certiorari in this case to consider whether a mandatory parolee who is incarcerated after committing a new crime while on parole may have his presentence confinement credit ("PSCC") applied toward the sentence resulting from the new charge, or must have it apply toward the sentence for which he was on parole.[1]  In addressing this question, we specifically consider the scope and effect of section 18–1.3–405, 6 C.R.S. (2002)[2] on mandatory parolees who commit a new offense while on parole in light of the 1988 amendment to that statute and the General Assembly's 1993 amendments to the felony sentencing scheme.

In examining this issue, the court of appeals construed section 18–1.3–405 together with section 17–22.5–203, 6 C.R.S. (2002), and concluded that, when read together, these two statutes created ambiguity as to whether PSCC should attach to the new charge or the previous one.  *People v. Norton,* 49 P.3d 344, 346 (Colo.App.2001).  The court concluded that until such time as the defendant's parole was revoked, the time he spent in jail was attributable to the new offense, and hence, PSCC must be applied against the new charge.  *Id.*

We reverse.  We hold that the plain meaning of section 18 1.3–405 indicates that PSCC earned as a result of being reincarcerated on a parole violation must be applied against the previous offense.  The plain language of section 18–1.3–405, coupled with the legislative intent evidenced in the 1988 amendment of that statute and the 1993 amendments to the criminal sentencing scheme, lead us to the conclusion that application of PSCC to the previous offense is the only means by which the courts can avoid granting duplicative credit to offenders, a result the General Assembly unambiguously sought to prevent. We also find the court of appeals' reliance on section 17–22.5–203 misplaced, and hold that

---

1.  The issue upon which we granted certiorari is as follows:  Whether the court of appeals erred in concluding that when a mandatory parolee is entitled to presentence confinement credit for jail time served in connection with new crimes committed while on parole, that presentence confinement credit must be awarded against the new sentence imposed for those new crimes, rather than against the sentence for which he was on parole.

2.  Formerly section 16–11–306, 6 C.R.S. (2001). For the sake of clarity, we will refer to the statute by its current section number of 18–1.3–405 throughout this opinion, despite the fact that most of the earlier cases we interpret herein refer to it as section 16–11–306.

that statute is inapplicable to the present case.

## I. FACTS AND PROCEDURAL HISTORY

In 1999, after being incarcerated on two previous felony convictions (the "previous offenses"),[3] Respondent Jason T. Norton was released on mandatory parole to an Intensive Supervision Program. Norton subsequently left his area of confinement without notifying his parole officer. As a result, he was arrested and charged with the new crime of escape. Norton remained in jail for approximately sixty-nine days until he pled guilty to attempted escape and received a stipulated sentence of eighteen months (the "new" or "current" offense) in the Department of Corrections ("DOC"), to be served consecutively with his previous sentences. Shortly thereafter, Norton's parole on the previous convictions was revoked. Norton sought to have his sixty-nine days of PSCC applied against the eighteen month sentence for attempted escape, a request the trial court denied.

The court of appeals reversed, holding that Norton's PSCC should have been applied against his sentence for attempted escape. In arriving at this holding, the court of appeals based its reasoning on the "interplay" between section 18–1.3–405 and section 17–22.5–203 and this court's decision in *Wiedemer v. People,* 784 P.2d 739 (Colo.1989). *Norton,* 49 P.3d at 346. The court determined that section 17–22.5–203, as interpreted and applied by this court in *Wiedemer,* required that the time between Norton's release onto parole and the revocation of his parole was not deemed part of his "sentence" for the previous offenses. *Id.* Therefore, the court of appeals reasoned, any PSCC earned while in jail awaiting sentencing on the new offense and prior to the revocation of parole could only be applied against the new offense. *Id.*

The State disagreed with the court of appeals' interpretation, arguing that there is no conflict between section 18–1.3–405 and section 17–22.5–203 because the latter applies only to discretionary parolees. The State also contends that the plain language of section 18–1.3–405, coupled with the intent of the mandatory parole scheme, requires that where an offender commits a new offense while on parole for previous offenses, any PSCC earned must be applied against the previous offense in order to avoid duplicative credit. We agree with the State's interpretation, and now reverse.

## II. SECTION 18–1.3–405, 6 C.R.S. (2002)

Because this case in large part turns on the interpretation of section 18–1.3–405, we begin our analysis with that statute:

> A person who is confined for an offense prior to the imposition of sentence for said offense is entitled to credit against the term of his or her sentence for the entire period of such confinement. At the time of sentencing, the court shall make a finding of the amount of presentence confinement to which the offender is entitled and shall include such finding in the mittimus. Such period of confinement shall be deducted from the sentence by the department of corrections. If a defendant is serving a sentence *or is on parole for a previous offense* when he or she commits a new offense and he or she continues to serve the sentence for the previous offense while charges on the new offense are pending, the credit given for presentence confinement under this section shall be granted against the sentence the defendant is currently serving for the previous offense and shall not be granted against the sentence for the new offense.

§ 18–1.3–405, 6 C.R.S. (2002) (emphasis added). The last sentence of the statute was added as an amendment in 1988. Ch. 110, sec. 2, § 16–11–306, 1988 Colo. Sess. Laws 663–64. The highlighted language, bringing parolees within the scope of the bill, was added to the proposed amendment by the Senate Judiciary Committee. *Hearing Before the Senate Judiciary Comm.,* 56th Gen. Assemb., 1st Sess., 4:10 p.m. (1988) (testimony of Sen. Cole). The bill as amended by the Senate Judiciary Committee was subsequently adopted by the House without further

---

**3.** Norton was convicted in 1997 for first degree criminal trespass and vehicular eluding, both class five felonies, and placed on mandatory parole in July of 1998.

change. H.B. 88–1156, 56th Gen. Assemb., 1st Sess., 10:26 a.m. (1988). The statute was not amended as a result of the comprehensive changes later made to the criminal sentencing scheme in 1993, nor has it been amended since that time.

To understand the 1993 amendments to the criminal sentencing scheme, a brief overview of the history of the sentencing statutes leading up to those amendments may prove a useful starting point. Prior to 1979, once an offender became eligible for parole, the parole board made the sole determination of whether, when, and for what amount of his remaining prison term an offender was released on parole. *Martin v. People,* 27 P.3d 846, 865 (Colo.2001) (Coats, J., dissenting). In 1979, the General Assembly adopted "determinate" sentencing which, among other things, mandated that offenders who had acquired certain "good time" and "earned time" credits must be released on parole. *Thiret v. Kautzky,* 792 P.2d 801, 804, n. 6 (Colo.1990); *see also* ch. 157, secs. 1–26, 1979 Colo. Sess. Laws 664–672. This change effectively created a system of mandatory parole and significantly diminished the discretion of the parole board. *Thiret,* 792 P.2d at 804. In 1985, however, the legislature amended the parole statutes another time, once again vesting the parole board with complete discretion to grant or deny parole to offenders, with the exception of those serving sentences for crimes committed on or after July 1, 1979 but before July 1, 1985. *Id.* This was how the criminal sentencing scheme stood as of the 1988 amendments to section 18–1.3–405.

■ The inception of statutory mandatory parole in 1993 yet again radically altered this balance by implementing a specific, nondiscretionary term of parole. Under the new system, the length of the parole term is no longer related to the unserved remainder of the sentence to confinement. Instead, all class two through six felons are subject to a mandatory period of parole when their period of incarceration terminates (either by its natural expiration or as a result of an early release decision by the parole board). § 18–1.3–401(1)(a)(V)(B), 6 C.R.S. (2002). The length of the mandatory parole period is predetermined by the class of felony of which

the offender has been convicted. § 18–1.3–401(1)(a)(V)(A). Thus, "mandatory parole is a statutorily prescribed sentence component that attaches automatically to any sentence involving imprisonment," *Craig v. People,* 986 P.2d 951, 959 (Colo.1999), and the penalty imposed on felony offenders consists of both an incarceration component and a parole component. *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002).

Because the amendment to section 18–1.3–405 in 1988 predated the introduction of the mandatory parole scheme in 1993, however, that amendment as originally enacted could only have contemplated the inclusion of discretionary parolees within its scope. The General Assembly, however, has made no further amendments to section 18–1.3–405 since 1988. The task before us today, then, is to determine whether the introduction of the mandatory parole scheme resulted in the incorporation of mandatory parolees within the scope of section 18–1.3–405, or whether that statute still remains applicable only to discretionary parolees. This analysis, in turn, will enable us to determine towards which offense Norton's PSCC must be applied.

■ With this introduction to the context within which our inquiry must take place, we now proceed to a direct analysis of the statute at issue. Our primary responsibility in any statutory analysis is to give effect to the General Assembly's intent. *Martin,* 27 P.3d at 851. As a result of the interrelated and complex legislative history of section 18–1.3–405 and the mandatory parole scheme, an analysis of legislative intent, insofar as it can be discerned, is a critical part of our inquiry. The initial step in such an analysis, however, is an examination of the plain language of the statute itself. *Id.*

### A. Plain Language Analysis

■ The portion of section 18–1.3–405 most relevant to our analysis is the second clause of the last sentence of the statute, to wit: "the credit given for presentence confinement under this section shall be granted against the sentence the defendant is currently serving for the previous offense and shall not be granted against the sentence for

the new offense." § 18–1.3–405, 6 C.R.S. (2002). The critical question is whether "the sentence the defendant is currently serving for the previous offense" incorporates the mandatory parole component of an offender's sentence, or instead refers solely to the incarceration component. The court of appeals held that the latter interpretation was correct. We disagree.

Although it is true that when the General Assembly amended section 18–1.3–405 in 1988 it could only have anticipated that discretionary parolees would be subject to the dictates of the statute, there is also no persuasive reason to believe that mandatory parole was intended to be excluded from the scope of an offender's "sentence" when the sentencing scheme was amended in 1993. Indeed, the fact that the General Assembly did not in 1993 nor any time thereafter see fit to amend section 18–1.3–405 to expressly exclude mandatory parolees compels the opposite conclusion.

■ Moreover, although under mandatory parole the length of the parole term ceased to be related to any unserved portion of confinement in the DOC and instead became statutorily predetermined, there is no indication in the legislative history or otherwise that parole did not continue to be part of an offender's "sentence." Although not served within the confines of an institution, parole is nevertheless a clear infringement on an offender's liberty, and thus logically part of his or her sentence. *Martin,* 27 P.3d at 867 (Coats, J., dissenting) (citation omitted). "Sentence" is defined as "[t]he judgment that a court formally pronounces after finding a criminal defendant guilty; the punishment imposed on a criminal wrongdoer." *Black's Law Dictionary* 1367 (7th ed.1999). Although the period of mandatory parole is predetermined, it is nevertheless part of "the punishment imposed on a criminal wrongdoer."

■ In addition, this court has previously held that the term "sentence" incorporates both the incarceration component and the mandatory parole component of an offender's penalty. *See Luther,* 58 P.3d at 1015 ("The penalties for felony offenders under [the 1993 sentencing] scheme include both an incarcer-

ation component and a mandatory parole component."); *State v. Johnson,* 13 P.3d 309, 314 (Colo.2000) ("Mandatory parole remains a distinct element of the overall sentencing regime...."); *Craig,* 986 P.2d at 961 ("[T]erms of imprisonment and mandatory parole terms are distinct elements of the sentencing regime.").

■ Accordingly, under a plain language analysis, the phrase, "the sentence the defendant is currently serving for the previous offense" appears to incorporate the term of mandatory parole within its scope. As a result, while serving the mandatory parole component of the penalty imposed on him for his previous offenses, Norton was indeed serving his "sentence ... for the previous offense" as contemplated by section 18–1.3–405 while awaiting sentencing on the new charge of escape.

■ Based on this analysis alone, the plain language of the statute, as applied to Norton, can be construed without ambiguity. "If the statutory language unambiguously sets forth the legislative purpose, we need not apply additional rules of statutory construction to determine the statute's meaning." *Martin,* 27 P.3d at 851 (citations omitted). Because Norton was serving the mandatory parole component of his sentence when he committed the new offense and had not completed his parole term at any time prior to being sentenced for his new offense, Norton was both "on parole" and "continu[ing] to serve the sentence for the previous offense" within the meaning of section 18–1.3–405. The plain language of the statute therefore requires that the sixty-nine days Norton spent in presentence confinement must be applied to the term remaining on his mandatory parole period for the previous offenses.

■ We proceed beyond this plain language analysis, however, because Norton contends that section 18–1.3–405 is, in fact, ambiguous, and argues that it conflicts with other portions of the criminal sentencing scheme, legislative history, prior law, and the goal intended to be achieved by the statute. In addition, Norton claims that the construction of section 18–1.3–405 that the State ad-

vocates could result in situations in which offenders would receive no credit whatsoever for time served in confinement pending charges on a new offense. If a statute appears ambiguous, then a court must proceed beyond a plain language analysis and consider legislative history, prior law, the goal intended to be achieved by the statute, and the consequences of a given construction of the statute in order to ascertain its meaning. *Martin,* 27 P.3d at 851. Because of Respondent's arguments, and because the court of appeals took them into consideration in rendering its decision, we now turn to an examination of these additional factors.

### B. Legislative History

██ As discussed earlier, the 1988 amendment to section 18–1.3–405 consisted of the addition of the final sentence to the current statute.[4] Representative Berry, the sponsor of the bill, described the purpose of the amendment to the House Judiciary Committee. He explained that criminal offenders often committed additional crimes while incarcerated, and that the PSCC they then acquired while in confinement awaiting sentencing on the new charge had oftentimes resulted in duplicative credit; that is, such offenders received credit both against their new sentence and against their existing sentence. *Hearing on H.B. 88–1156 Before the House Judiciary Comm.,* 56th Gen. Assemb., 1st Sess., 3:04 p.m. (1988) (testimony of Rep. Berry). The addition of the last sentence to section 18–1.3–405, therefore, was expressly intended to prevent the award of duplicative credit to offenders under this scenario. *Id.*

It was not until the bill was heard in the Senate Judiciary Committee that the phrase "or is on parole for a previous offense" was added. Two important points can be discerned from the record of this hearing. First, the Committee was aware that the purpose of the proposed amendment was to prevent duplicative credit being awarded to inmates who committed additional crimes

while incarcerated. *Hearing on H.B. 88–1156 Before the Senate Judiciary Comm.,* 56th Gen. Assemb., 1st Sess., 4:10 p.m. (1988). Second, a committee member proposed to include parolees within the scope of the amendment, and that additional language was passed by a voice vote with little discussion. *Id.* at 4:12 p.m. The Senate subsequently passed the bill on second reading without discussion, Sen. Journal 484 (1988), and the House likewise accepted the bill, as amended, without discussion. House Journal 812 (1988). Therefore, it is clear that the final sentence of section 18–1.3–405 was intended to prevent duplicative PSCC being granted to inmates who committed another crime either when they were incarcerated or when they had been released on discretionary parole.

██ The way in which the court of appeals interpreted section 18–1.3–405, however, thwarts that very intent. Under the mandatory parole scheme, the predetermined term of mandatory parole that offenders receive can neither be waived nor suspended by the court. *Craig,* 986 P.2d at 958 (citing § 18–1–105(1)(a)(V)(B), currently codified at § 18–1.3–401(1)(a)(V)(B), 6 C.R.S. (2002)). As a result, unlike the prior discretionary parole scheme, regardless of whether an offender serves his mandatory parole term outside the institution or in jail awaiting sentencing on a new offense, he still continues to serve out his period of mandatory parole. In other words, an offender gets the same credit for his mandatory parole term irrespective of the point at which his parole is actually revoked. If Norton is allowed to apply his sixty-nine days of PSCC against the new charge, therefore, he would be receiving duplicative credit—the sixty-nine days would apply *both* against his mandatory parole period on the previous offenses and against the incarceration component of his sentence on the new offense. The award of duplicative credit, however, was precisely the result the

---

4. That sentence reads as follows: If a defendant is serving a sentence or is on parole for a previous offense when he or she commits a new offense and he or she continues to serve the sentence for the previous offense while charges on the new offense are pending, the credit given

for presentence confinement under this section shall be granted against the sentence the defendant is currently serving for the previous offense and shall not be granted against the sentence for the new offense.

General Assembly sought to avoid in amending section 18–1.3–405.

Additionally, the court of appeals' construction of section 18–1.3–405, by its award of duplicative credit, would create an unintended benefit for offenders such as Norton who violate their terms of parole. Not only would Norton continue to serve out his period of mandatory parole without penalty, he would also be gaining PSCC against the new charge pending against him. This outcome would vitiate the intent of the statutory penalty applicable to the crime for which the sentence was imposed.

We therefore hold that in order to give consistent and harmonious effect to the legislative intent, "sentence," as used in section 18–1.3–405, must encompass both the period of incarceration to the DOC and the statutorily determined period of mandatory parole. To hold otherwise would render the term "or is on parole for a previous offense" meaningless for all but discretionary parolees; that is, no mandatory parolee could ever satisfy the last sentence of section 18–1.3–405 under the court of appeals' interpretation. There is no indication in the legislative history of either section 18–1.3–405 or in the 1993 sentencing amendments indicating that such was the General Assembly's intent. To the contrary, the clearest objective that emerges from scrutiny of the legislative history is the prevention of duplicative credit, a goal that our construction of the statute reinforces.

## C. Prior Law

Norton argues that recent decisions by this court conflict with the interpretation of "sentence" that we render today. *See Martin*, 27 P.3d at 858; *Johnson*, 13 P.3d at 314.

Those cases, however, interpreted different areas of the criminal sentencing scheme, and are accordingly distinguishable on their facts and by the particular statute in question. In order to forestall potential confusion, we now turn to a discussion of these recent cases in an effort to distinguish our present interpretation of the meaning of "sentence" as used in section 18–1.3–405, from those decisions.

### 1. *People v. Johnson*

In *Johnson*, this court interpreted the meaning of section 18–1.3–301(1), 6 C.R.S. (2002),[5] which addresses the placement of offenders into community corrections programs. Subsection (1)(e) of the statute requires that, if an offender is rejected after acceptance by a community corrections program and subsequently resentenced by the trial court, the sentence imposed by the trial court may not exceed the offender's original sentence.[6] Thus, the issue in *Johnson* was whether the subsequent "sentence" imposed by the trial court included the term of mandatory parole or only the term of incarceration. We held that it was the latter, reasoning that because mandatory parole terms are beyond the trial court's authority to impose, they were not in this context intended to have any bearing upon the term of incarceration available for imposition by the trial court. *Johnson*, 13 P.3d at 313–14.

Thus, as used in the particular statute, "offender's sentence" specifically referenced the term of incarceration the trial court could impose. Because the offender was being sentenced to a term of incarceration—in some instances for the first time [7]—the term "offender's sentence" logically referred only to the maximum term the trial court could

---

5. Formerly section 17–27–105(1)(e), 6 C.R.S. (1999), and so referred to in *Johnson*.

6. This subsection reads as follows:
   If an offender is rejected after acceptance by a community corrections board or a community corrections program, the court may resentence the offender without any further hearing so long as the *offender's sentence* does not exceed the sentence which was originally imposed on the offender.
   § 18–1.3–301(1)(e), 6 C.R.S. (2002) (emphasis added). The highlighted language indicates the term we were construing in *Johnson*.

7. As we explained in *Johnson*, a defendant may be placed in community corrections by one of three ways: (1) directly by the trial court, with no term of incarceration; (2) by referral from the DOC; and (3) as a condition of probation. *Johnson*, 13 P.3d at 313. Therefore, offenders placed into community corrections programs directly by the trial court under the first option had not previously been sentenced to a term of incarceration.

impose under the presumptive penalty ranges for felony offenses. The critical question in *Johnson*, then, was identifying what portion of an offender's sentence was within the trial court's authority to impose. The only reasonable conclusion was that component of the sentence over which the court had discretion, i.e., the term of incarceration to the DOC. In the immediate statutory context, by contrast, the term "sentence," in view of the legislative goal to be achieved, logically refers to *both* components of the sentencing regime.

### 2. *Martin v. People*

The trial court's authority to impose only the incarceration component of a felon's sentence is likewise the distinguishing element in *Martin.* In that case, we determined that of two conflicting statutes, each indicating different maximum terms to which a sexual offender could be released on parole, the specific statute prevailed over the general one. *Martin*, 27 P.3d at 860. The prevailing statute indicated that while the parole board had the sole authority to grant or withhold parole and the conditions thereof, it had no discretion to "exceed the maximum sentence imposed upon the inmate by the court or five years, whichever is less." *Id.* at 852 (citing § 17–2–201(5)(a), 6 C.R.S. (2000)). This language then raised the question of whether the term "maximum sentence" referred to the term of incarceration and the mandatory parole period combined, or solely to the term of incarceration. *Id.* at 855–59.

We held that the term "maximum sentence" only referred to the incarceration component of the defendant's sentence, *id.* at 859, because we concluded that the General Assembly did not intend to apply the mandatory parole provisions to sexual offenders. *Id.* at 854–55. The decision in *Martin* therefore turned on the question of whether mandatory parole was applicable to sexual offenders in the first instance.

Even had we had arrived at the opposite conclusion in *Martin*, however, i.e., that mandatory parole did apply to sexual offenders, our interpretation of the term "maximum sentence ... imposed by the court" would

likely have been the same. As in *Johnson*, this statute was specifically referencing that component of the sentencing regime that the trial court had the discretion to impose. Indeed, the term "maximum sentence" (as opposed to just the term "sentence") has been interpreted as referring to one end of the presumptive penalty range spectrum. *See id.* at 857. This logic is likewise consistent with our holdings in *Craig v. People*, 986 P.2d 951, 962 (Colo.1999) (holding that a sentence "to the 'Department of Corrections' " referenced only the term of imprisonment imposed by a trial court) and *Benavidez v. People*, 986 P.2d 943, 948 (Colo.1999) (same).

In summary, both *Johnson* and *Martin*, although seemingly contradictory to our holding today in their conclusions that the term "sentence" referred only to the incarceration component of an offender's penalty, are distinguishable by means of the statute they were interpreting and the particular legislative intent they were giving effect to. We have consistently held that a felony offender's penalty or sentence consists of both an incarceration component and a mandatory parole component.[8] *Luther*, 58 P.3d at 1015; *Johnson*, 13 P.3d at 314; *Craig*, 986 P.2d at 961. What we do today is simply to construe those components separately because of the language of the statute and our interpretation of the legislative objective to be achieved.

### D. Consequences of Our Interpretation of Section 18–1.3–405

■■■ Our final responsibility in interpreting section 18–1.3–405 is to give due consideration to any unintended consequences which may result from our construction of the statute. In that vein, we are aware that different consequences may accrue to mandatory parolees who are able to post bail while awaiting sentencing on new charges versus those who remain incarcerated because of their inability to do so. Specifically, although both types of offenders will continue to receive credit for serving out their respective periods of mandatory parole resulting from their previous offenses, the inmate who re-

8. This includes, as indicated earlier, only class two through five felonies.

mains incarcerated while awaiting sentencing on the new charge will be credited no "extra" time for this period of presentence confinement.

In *Schubert v. People*, 698 P.2d 788 (Colo. 1985), prior to the inception of mandatory parole, this court construed a 1979 amendment to section 16–11–306,[9] the forerunner to the current section 18–1.3–405. Although the prior version of the statute had allowed trial judges the discretion whether or not to award PSCC, the 1979 amendment made PSCC mandatory. *Id.* at 794. The majority held that the purpose of this amendment was to rectify "the unequal treatment of indigent offenders who, due to their inability to post bail ... would serve longer periods in jail than their wealthier counterparts who were able to avoid presentence confinement by posting bail and thereby secure their presentence freedom." *Id.* The majority, however, failed to cite any authority, legislative or otherwise, for this conclusion. Indeed, specially concurring Justice Lohr pointed out that he knew "of no support for that conclusion" and that the purpose of the amendment might just as likely. have "been to eliminate perceived disparities in the manner in which the statutory discretion was being exercised by trial judges" or to "promote the perception of fairness," or "to accomplish some other objective not within our ken." *Id.* at 797 (Lohr, J., specially concurring). Given that the majority in *Schubert* cited no legislative authority for its interpretation, coupled with the fact that *Schubert* interpreted a previously worded version of section 18–1.3–405 and that this interpretation preceded the mandatory parole scheme, we accordingly find *Schubert* not dispositive of the current issue.

Our primary responsibility is to interpret section 18–1.3–405 in the manner most consistent with the legislative intent motivating the statute. Because the goal of the 1988

amendment to section 18–1.3–405 was to prevent the award of duplicative credit, and given the effect that the introduction of mandatory parole had on the felony sentencing scheme in 1993, we view our plain language interpretation of section 18–1.3–405 as the only means by which we can adequately carry out these legislative goals. Moreover, we assume that the legislature was aware of the language used in the amended version of section 18–1.3–405 when it implemented the mandatory parole scheme in 1993, and "construction of legislation, acquiesced in for many years by the authorities charged with its enforcement, is entitled to great weight in determining the intent of the framers." *Security Life and Accident Co. v. Heckers*, 177 Colo. 455, 495 P.2d 225, 227 (1972). For these reasons, we hold that our plain language analysis of section 18–1.3–405 set forth in section II.A., requiring any PSCC acquired to be applied against the mandatory parole term, pertains to Norton.

In summary, we hold that the plain language of section 18–1.3–405, together with the legislative intent evidenced in the 1988 amendment to that statute and the introduction of the mandatory parole scheme in 1993, requires that an offender such as Norton, who acquires PSCC as a result of being jailed for a new offense committed while on mandatory parole, must apply that PSCC towards the parole component of his previous offense. First, we view this as the only means by which to give effect to the General Assembly's intent to prevent the award of duplicative credit to offenders who commit a new crime while serving either the incarceration component or the parole component of a previous felony offense. Second, we conclude that this interpretation is not in conflict with our prior case law finding the term "sentence" to include only the incarceration component of the sentencing scheme because those cases involved different statutes and were specifically considering that portion of

9. The General Assembly in 1979 repealed the then-current version of section 16–11–306 and reenacted it as follows:

A person who is confined prior to the imposition of sentence is entitled to credit against the term of his sentence for the entire period of confinement. At the time of sentencing, the court shall make a finding of the amount of presentence confinement to which the offender is entitled and shall include such finding in the mittimus. Such period of confinement shall be deducted by the Department of Corrections. *Schubert*, 698 P.2d at 793 (citing ch. 157, sec. 7, § 16–11–306, 1979 Colo. Sess. Laws 664, 665–66).

an offender's sentence that a trial court had the authority to impose. Third, while aware that our interpretation may result in those offenders who are unable to post bail not receiving "extra" PSCC for this period of incarceration, we conclude that this consequence is unavoidable if we are to give effect to the legislature's intent.

### III. SECTION 17–22.5–203, 6 C.R.S. (2002)

■ Finally, the court of appeals found section 17–22.5–203, together with our decision in *Wiedemer v. People*, 784 P.2d 739 (Colo.1989), to be dispositive of the current issue. We find this reliance misplaced. Section 17–22.5–203(1) provides that when an inmate is reincarcerated after his parole is revoked, he is to serve any term still remaining on his original sentence, without credit for the time he spent out on parole.[10] Part 2 of Article 22.5 of Title 17, however, which includes section 17–22.5–203, is expressly limited by its terms to "Offenders Sentenced for Crimes Committed Prior to July 1, 1979." Tit. 17, Art. 22.5, Pt. 2, 6 C.R.S. (2002). Because Norton was on parole for offenses committed in September 1995 and September 1996, section 17–22.5–203 cannot be applicable to him.

The terms set forth in Part 3 of Article 22.5 reinforce our conclusion. That part, in contrast to Part 2, expressly applies to "Offenders Sentenced for Crimes Committed on or After July 1, 1979." Tit. 17, Art. 22.5, Pt. 3, 6 C.R.S. (2002). Consistent with this heading, Part 3 sets forth different methods for calculating offenders' "good" and "earned" time credits for (1) crimes committed between July 1, 1979 and July 1, 1981, (2) crimes committed between July 1, 1981 and July 1, 1985, and (3) crimes committed on or after July 1, 1985. This specific delineation indicates a legislative intent to create a clear chronological distinction among the treatment of offenders depending upon the sentencing scheme in place at the time they committed their crime. *See Thiret v. Kautzky*, 792 P.2d 801, 805 (Colo.1990).

Finally, the terms of section 17–22.5–203 appear to logically apply only to discretionary parole, which was, of course, the only type of parole in effect prior to July 1, 1979. Before that date, if and when the parole board decided to release an inmate, that inmate, barring the commission of new offenses, would serve out the remainder of his court-ordered sentence on parole. This reflected "the historical understanding of 'parole' as a privilege allowing an inmate to *exchange* a certain portion of his or her prison term for a period of non-imprisonment custody." *Craig*, 986 P.2d at 958, n. 3 (emphasis in original) (citing *People v. Hunter*, 738 P.2d 20, 22 (Colo.App.1986) (referring to discretionary parole as a "special privilege [granted the inmate] to be outside the walls of the institution while serving his sentence.")). It is therefore unsurprising that upon revocation of parole and reincarceration, an inmate would simply be required to serve out whatever remained of his sentence, and indeed, this is what section 17–22.5–203, applicable to crimes committed prior to July 1, 1979, appears to provide. Moreover, the statute expressly forbids the treatment of parole as any part of an offender's sentence, an interpretation clearly at odds with the present definition of an offender's sentence as consisting of both an incarceration component and a mandatory parole component. For these reasons, we hold that section 17–22.5–203 is inapplicable to the case before us, and the court of appeals erred in taking it into consideration.

The court of appeals also considered our application of section 17–22.5–203 in *Wiedemer* in rendering its decision. The defendant in *Wiedemer* had been incarcerated for crimes committed in 1984, released on discretionary parole, then reincarcerated for new crimes committed while he was on parole. He sought PSCC against his previous charge

---

10. The pertinent section of that statute reads as follows:

(1) The paroled inmate, upon an order of the state board of parole, may be returned to the custody of the department according to the terms of his original sentence, and, in comput-ing the period of his confinement, the time between his release and his return to said custody shall not be considered any part of the term of his sentence. § 17–22.5–203(1), 6 C.R.S. (2002).

for the time he served in jail between his arrest and his parole revocation. Although the defendant's crimes in *Wiedemer* were committed after 1979, in interpreting section 17–22.5–203(1) 8A C.R.S. (1986), we held that any PSCC awarded must be applied against the new charge. *Wiedemer*, 784 P.2d at 741. Although contradictory to the interpretation we render today, *Wiedemer* was decided prior to the introduction of the mandatory parole scheme in 1993 and interpreted a statute that was intended to apply only to discretionary parolees. In addition, unlike *Wiedemer*, Norton's case is expressly governed by section 17–22.5–403(7), a statute which had not yet been enacted when *Wiedemer* was decided. *See* ch. 120, sec. 19, § 17–22.5–403, 1990 Colo. Sess. Laws 947. We accordingly reject *Wiedemer*'s applicability in the immediate case, and hold that the court of appeals erred in taking it into consideration.

## IV. CONCLUSION

We hold that the approximately sixty-nine days of presentence confinement Norton acquired while in jail awaiting sentencing on his new charge are to be applied toward the mandatory parole component of his previous offenses, and not toward the incarceration component of his new sentence for attempted escape. We conclude, based in part on our examination of the legislative history of section 18–1.3–405 and the mandatory parole scheme, that the plain language of section 18–1.3–405 compels such a result. In our view, to hold otherwise would vitiate the legislative intent evidenced in the 1988 amendment to section 18–1.3–405 to prevent duplicative credit from being granted offenders who committed a new crime either while in jail serving the incarceration component of a previous offense or while on parole for a previous offense. We conclude that the court of appeals erred in its conclusion that Norton's presentence confinement credit should be applied toward his new offense, and accordingly reverse.

Justice MARTINEZ dissents, and Justice BENDER joins in the dissent.

Justice MARTINEZ dissenting:

The Majority concedes that section 18–1.3–405, 6 C.R.S. (2002), as enacted and amended, addressed discretionary parole, and has not been amended to account for mandatory parole. Maj. op. at 348. Because I find that the Majority's retrofit of section 18–1.3–405 to accommodate mandatory parole constitutes an arrogation of the legislative power to amend section 18–1.3–405, and because I find the Majority's interpretation violates the spirit and intent of that statute, I respectfully dissent.

In July 1998, Jason Norton was discharged from his sentence of imprisonment to the mandatory parole component of his previous concurrent felony sentences. In September 1999, Norton was arrested and charged with escape. Norton was incarcerated while the charge was pending, and Norton's mandatory parole on the previous offenses remained unrevoked prior to sentencing. Norton was offered bail, but could not afford it. At the time of sentencing in January 2000, Norton had served sixty-nine days in prison. Because mandatory parole does not fit within the prohibition against duplicative credit, section 18–1.3–405 mandates that a trial court make a finding of the presentence confinement credit on a new offense.

### I. "Sentence" Means "Sentence to Imprisonment"

Section 18–1.3–405 was enacted in 1979 to grant presentence confinement credit on an offense which caused that presentence confinement, *People v. Ostuni*, 58 P.3d 531, 533 (Colo.2002);

> A person who is confined for an offense prior to the imposition of sentence for said offense is entitled to credit against the term of his or her sentence for the entire period of such confinement. At the time of sentencing, the court shall make a finding of the amount of presentence confinement to which the offender is entitled and shall include such finding in the mittimus. Such period of confinement shall be deducted from the sentence by the department of corrections.

§ 18–1.3–405. Therefore, a court *must* make a finding of a presentence confinement cred-

it, unless prohibited under the later 1988 amendment that disallowed duplicative credit when an offender continued to serve a previous offense:

> If a defendant is serving a sentence *or is on parole for a previous offense when he or she commits a new offense and he or she continues to serve the sentence for the previous offense while charges on the new offense are pending,* the credit given for presentence confinement under this section shall be granted against the sentence the defendant is currently serving for the previous offense and shall not be granted against the sentence for the new offense.

*Id.* (emphasis added).

Because I would hold that for purposes of section 18–1.3–405, an offender released to mandatory parole never "continues to serve the sentence for [a] previous offense," whether or not parole is revoked, a court must, under the mandate of section 18–1.3–405, make a finding of presentence confinement credit for a new offense.

Section 18–1.3–405 was substantively amended most recently in 1988 when a discretionary parole scheme was in place. Therefore, the term "parole" implied a period of discretionary and not mandatory parole. In a discretionary parole regime, an offender, whether serving parole on the street or in prison, continued to serve his sentence to imprisonment. "[O]ne who is on [discretionary] parole is granted a special privilege to be outside the walls of the institution while serving his sentence.... At the same time the parolee remains in constructive custody ... [and] a defendant's release on parole 'in no way alters the fact that he is still under sentence.' " *People v. Lucero,* 772 P.2d 58, 60 (Colo.1989) (citing *People v. Salvador,* 189 Colo. 181, 183, 539 P.2d 1273, 1275 (1975)). An offender on discretionary parole is released from prison for the unserved portion of his prison sentence, *Martin v. People,* 27 P.3d 846, 858 (Colo.2001); but if the offender violates the terms of his parole, and is reincarcerated for violation of parole, he serves in prison the remaining term of his sentence to imprisonment. *Id.* Therefore, it is abundantly clear that "sentence" in section 18–1.3–405 means sentence to imprisonment.

In contrast, when an offender is released to mandatory parole, he is no longer serving his sentence to imprisonment because it is discharged. § 18–1–105(1)(a)(V)(D), 6 C.R.S. (2002) ("If an offender has been granted release to parole supervision by the state board of parole, the offender shall be deemed to have discharged the offender's sentence to imprisonment ... as if such sentence were discharged pursuant to law....."). Without doubt, an offender's sentence includes two components: a term of incarceration and a period of mandatory parole. *People v. Johnson,* 13 P.3d 309, 313 (Colo.2000) (mandatory parole is a distinct element of sentencing, separate from the terms of incarceration or length of sentence imposed by the court). However, when released to mandatory parole, an offender is no longer serving a punitive sentence; rather, mandatory parole was instituted to ensure the successful reintegration of an offender into a community and to maintain public safety. *See* § 17–22.5–102.5(c), 6 C.R.S. (2002). Therefore, because an offender discharged to mandatory parole is no longer serving a sentence to imprisonment, he does not fit within the meaning of "sentence" intended by the legislature when it amended section 18–1.3–405 in 1988. Moreover, with regard to section 18–1.3–405, if parole is revoked, resulting in a parolee's reincarceration, he is not serving his sentence to imprisonment. Rather, the parolee may be reincarcerated for the period remaining on his mandatory parole, from which he is immediately eligible for parole. § 17–22.5–403(8)(a). As such, it is not the sentence to imprisonment conceived by the legislature when it amended section 18–1.3–405, but something entirely different.

## II. The Running of Mandatory Parole and Presentence Confinement Credit

Although the Majority concedes that mandatory parole is not a sentence to imprisonment, and additionally that a discretionary parole regime was in effect in 1988 when section 18–1.3–405 was last amended, it nevertheless finds that the prohibition against duplicative credit evolved to accommodate mandatory parole. The Majority's recitation

of legislative history of the 1988 amendment to prescribe duplicative credit, Maj. op. at 345–346, does nothing to clarify the issue at hand: whether duplicative credit results if presentence confinement credit is granted to a mandatory parolee whose parole continues to run while awaiting sentencing. I would find that presentence confinement credit to a mandatory parolee does not violate the intent of the legislature.

### A. Duplicative Credit

An offender on mandatory parole serves one day of his mandatory parole time each day, whether he is in the community or in prison; therefore, parole need not be revoked for an offender to serve mandatory parole time. *See* § 17–22.5–405(5)(a), 6 C.R.S. (2002). Nor is a court order necessary for an offender to serve mandatory parole time. *See id.* When mandatory parole remains unrevoked, an offender, generally, serves that period of time in the community. Indeed, the purpose of mandatory parole is to rehabilitate and reintegrate an offender into a community. A community sentence to mandatory parole is not punitive, and therefore, when an offender is reincarcerated whether awaiting sentencing on another offense, or whether he is reincarcerated due to revocation, he is serving something less than, and different from, a sentence to imprisonment.

Thus, the running of a period of mandatory parole in addition to presentence confinement credit on a new offense does not constitute duplicative credit as envisioned by the General Assembly. I agree with the Majority's assessment of the legislative history—it indeed forbids duplicative credit. Maj. op. at 345. The committee remarks, however, undeniably refer to duplicative credits on sentences to imprisonment, resulting in a windfall for a multiple offender.

This court has voiced the same sentiment that duplicative credit is to be avoided when it vitiates a statutory penalty.

> Duplicative credits ... not only would reward the multiple offender but also would vitiate, to the extent of such credit, the statutory penalty applicable to the crime for which a particular sentence is imposed.

*People v. Johnson,* 797 P.2d 1296, 1298 (Colo. 1990) (citing *Schubert v. People,* 698 P.2d 788, 795 (Colo.1985)). Thus, the proscription of duplicative credit exists only in the context of reduction in a penalty.

I reiterate that Norton is not serving a sentence to imprisonment while on mandatory parole. Furthermore, his parole is not, in a punitive sense, a penalty, but serves to rehabilitate. As such, the running of mandatory parole and the grant of presentence confinement credit does not offend the intent contemplated by the legislature: credit is granted to only one sentence of imprisonment.

Because there is no duplicative credit, and since a mandatory parolee can never fit within the 1988 amendment denying presentence confinement credit, a court must follow the statutory mandate in section 18–1.3–405 to make a finding of presentence confinement credit and note it on the mittimus.

### B. A Denial of Presentence Confinement Credit to a Mandatory Parolee Raises Equal Protection Concerns

Unless an exception applies, and none does here, a court must make a finding of presentence confinement credit on a new sentence. In addition to the statutory mandate in section 18–1.3–405 to a trial court to make a finding of presentence confinement credit, our jurisprudence, grounded in fairness and justice, equally requires a trial court to do so. *People v. Jones,* 176 Colo. 61, 69, 489 P.2d 596, 600 (Colo.1971) (When presentence confinement credit was not yet statutorily mandated, we stated, a "trial judge should consider the time that a defendant is confined prior to the imposition of a sentence, and justice requires no less.") In 1979, the General Assembly enacted the forerunner to section 18–1.3–405, mandating presentence confinement credit. We interpreted that provision in *Schubert,* holding that the purpose of presentence confinement credit was to eliminate the unequal treatment of indigent defendants, who because of their inability to post bail, are treated differently than their wealthier counterparts who post bail. 698 P.2d at 794. We have never retreated

from this proposition, but rather have referred to it as a guiding principle of statutory interpretation: "[S]tatutory terms should be construed in a manner that avoids constitutional infirmities." *Fields v. Suthers,* 984 P.2d 1167, 1172 (Colo.1999); *see also Johnson,* 797 P.2d at 1298; *Massey v. People,* 736 P.2d 19, 21 (Colo.1987). The Majority now casually repudiates our jurisprudence, finding *Schubert* not dispositive. Maj. op. at 348. I find the Majority's discussion unconvincing.

First, the General Assembly has not addressed our rationale in *Schubert* in the context of presentence confinement credit and mandatory parole. Therefore, we should not usurp the legislative function and amend section 18–1.3–405 to add mandatory parole when the statute clearly meant discretionary parole. Second, the Majority states that the previously worded version of section 18–1.3–405 was at issue in *Schubert* and that *Schubert* failed to cite authority for the proposition that a denial of presentence confinement credit raises equal protection concerns. *Id.* Therefore it concludes that *Schubert* is inapplicable. *Id.* Since the 1988 amendments do not apply to a mandatory parolee, only the old wording of section 18–1.3–405 is applicable here—which is precisely what we addressed in *Schubert.* Moreover, our rationale in *Schubert* is now firmly embedded in our jurisprudence, such that a citation to an almost two-decade-old concurring opinion holds no weight. Equal protection concerns, therefore, remain compelling.

Our penal system, particularly section 18–1.3–405, specifically addresses the inequities that result when an indigent is unable to post bail and is simultaneously denied presentence confinement credit. The Majority is cognizant of that same concern, Maj. op. at 348: indigent defendants unable to make bail and who at the same time are denied presentence confinement credit are dealt a harsher penalty. As such, the Majority's argument that the equal protection concerns announced in *Schubert* are no longer compelling rings hollow.

It is undisputed that Norton's mandatory parole was unrevoked, that he was offered bail, and that the reason that he remained in

prison was the inability to make bail. Thus, to deny Norton presentence confinement credit to his new offense is to treat him differently from his wealthier counterparts, who would have enjoyed the freedom of serving mandatory parole in the community while awaiting sentencing. The legislature intended to remedy this very inequity by the enactment of section 18–1.3–405. Its intent must not be eviscerated by denying credit by erroneously applying an exception that does not fit in light of the new felony sentencing scheme.

### III. Conclusion

The Majority impermissibly amends section 18–1.3–405 to add mandatory parole, although it is clear that the legislature only meant discretionary parole. Its interpretation of the statute leads to results that could not have been intended by the legislature—the denial of presentence confinement credit to a mandatory parolee whose parole was unrevoked and who could not afford to make bail. I would affirm the judgment of the court of appeals. Accordingly, I respectfully dissent.

I am authorized to say that Justice BENDER joins in this dissent.