**The PEOPLE of the State of Colorado, Petitioners,**

v.

**THORO PRODUCTS COMPANY, INC., a Colorado corporation, and Richard Ernest Newman, Respondents.**

No. 01SC419.

Supreme Court of Colorado,
En Banc.

May 19, 2003.

Rehearing Denied June 16, 2003.*

* Chief Justice MULLARKEY, Justice MARTINEZ and Justice BENDER would grant the petition.

Ken Salazar, Colorado Attorney General, Eric Nelson, Special Assistant Attorney General, William C. Allison V, Assistant Attorney General, Dennis Hall, Special Assistant Attorney General, Appellate Division, Criminal Appeals, Denver, Colorado, Attorneys for Petitioner.

Jean E. Dubofsky, Jean E. Dubofsky, P.C., Boulder, Colorado, Attorney for Respondent.

Gablehouse, Calkins & Granberg, LLC, Timothy R. Gablehouse, Donn L. Calkins, Melanie J. Granberg, Denver, Colorado, Attorneys for Amicus Curiae Vintage Sales, LLC.

Alan G. Lance, Idaho Attorney General, Clive J. Strong, Deputy Attorney General, Darrell G. Early, Deputy Attorney General, Statehouse, Boise, Idaho, Attorneys for Amicus Curiae the State of Idaho, Department of Environmental Quality.

Peter A. Weir, Executive Director, Colorado District Attorneys Council, Denver, Colorado, Local Counsel for Amicus Curiae.

Justice RICE delivered the Opinion of the Court.

The People urge this court to reinstate Respondents' convictions for unpermitted disposal of hazardous waste in violation of section 25–15–310, 8 C.R.S. (2002). The court of appeals reversed the convictions af-

ter concluding that the prosecution of the Respondents was barred by the applicable statute of limitations. We affirm the judgment of the court of appeals.

We hold that the plain language of the statute, the apparent legislative policies underlying the statute, and the various federal interpretations of the term "disposal," do not provide a clear answer to the question presented herein, namely, whether the legislature intended the passive migration of waste to constitute the crime of unpermitted "disposal" of hazardous waste. We therefore conclude that the Respondents did not have adequate notice of the conduct the statute was intended to prohibit; specifically, the Respondents did not have notice that their failure to remediate contaminated soil and prevent the passive migration of previously spilled waste would constitute a continuing crime such that they would be subject to the possibility of criminal charges twelve years after the last affirmative act of disposal. Based on the rule of lenity, we accordingly construe this ambiguity in favor of the Respondents and hold that their prosecution is barred by the statute of limitations.

## I. FACTS

Thoro Products Company, Inc. and its CEO, Richard E. Newman, were accused of various crimes in connection with the unpermitted storage and disposal of hazardous waste.

Thoro, a manufacturer of spot remover and other cleaning products, was founded in 1902 by Newman's grandfather. After World War II, Newman's father became president of the company and the business was moved to its current location, an industrial area served by a railroad spur in Arvada.

Respondent, Richard E. Newman, began working for Thoro in 1974. He worked in several different roles in the business and soon rose to a supervisory position. Following his father's retirement in 1987, Newman became the president and CEO of the company.

This case arose as a result of Thoro's twenty-year business relationship with Dow Chemical Company. In 1964, as part of a plan to diversify its operations, Thoro became a bulk distribution facility for Dow. Dow shipped various chemicals to Thoro where they were pumped from rail cars into several above-ground storage tanks. Thoro would later pump the chemicals from the storage tanks into trucks for shipment to Dow's customers. Among the Dow chemicals shipped to Thoro were four types of chlorinated solvents later identified by the EPA to be potentially hazardous wastes.[1] These four solvents led to the plume of contamination at issue here.

While the solvents were handled at the Thoro facility, it was not uncommon for there to be a significant amount of spillage. Former employees of Thoro testified that spills occurred as a result of over-filled tank cars, leaky pumps and hoses, or accidents. Newman recounted three major spills—estimated to have discharged up to several hundred gallons of solvents—during the 1970s. Although the storage tanks were placed upon small concrete pads, the areas between the tanks and the rail tracks and between the tanks and the truck loading area were unpaved. It was therefore almost certain that a substantial amount of the solvents seeped into the soil.

The contract with Dow came to an end and Thoro stopped handling solvents at some point during 1984 or 1985, several years before Newman became CEO of the company.[2]

1. The four solvents were Tetrachloroethene (PCE), Trichloroethene (TCE), 1,1,1, Trichloroethane (1,1,1–TCA), and Methylene Chloride.

2. Respondents vigorously argued, both at trial and on appeal, that they stopped handling solvents in October 1984, prior to the effective date (November 2, 1984) of the Colorado hazardous waste management statute. See § 25–15–102(3), 8 C.R.S. (2002). Therefore, Respondents contend that their prosecution violated the *ex post*

*facto* clause of both the state and federal constitutions. U.S. Const. art. I, § 9, cl. 3; Colo. Const. art. II, § 11. The People, however, presented evidence that the handling of the Dow solvents continued through at least 1985. The jury made no specific finding with regard to this issue and the court of appeals, because of its holding on the statute of limitations question, did not address Respondents' *ex post facto* argument. For the purpose of this opinion, we will assume that

Eventually, the company's fortunes declined and by 1997, Thoro was officially dissolved as a Colorado corporation.

In the spring of 1995, high concentrations of chlorinated solvents were discovered in a water well at the Twins Inn bar and restaurant, located approximately one mile from the Thoro facility. The EPA began an investigation to determine the source of the groundwater contamination and eventually removed soil samples from the Thoro property. Based upon the nature and extent of the contamination found around the storage tanks, the EPA concluded that Thoro was responsible for the mile-long plume of contaminated groundwater.

In November 1996, the EPA, along with local law enforcement agents, executed a search warrant at the Thoro property and seized a variety of documents and records relating to Thoro's business relationship with Dow. Authorities also discovered several 55-gallon drums which, later analysis revealed, contained a mixture of various hazardous solvents.

Thoro Products Company, Inc. and Richard E. Newman were each indicted on three charges: (1) Unpermitted disposal of hazardous waste in violation of section 25–15–310, 8 C.R.S. (2002); (2) Unpermitted storage of hazardous waste in violation of section 25–15–310, 8 C.R.S. (2002); and (3) Criminal mischief, a class three felony in violation of section 18–4–501, 6 C.R.S. (2002).

After a two-week trial, Thoro was convicted of all three charges. The company was sentenced to probation for ten years and assessed a fine of $750,000 for criminal mischief, $100,000 for unpermitted disposal, and $100,000 for unpermitted storage.

Newman was convicted of two charges, unpermitted disposal and unpermitted storage of hazardous waste. During sentencing, the trial court found extraordinary aggravating circumstances and sentenced Newman to consecutive terms of incarceration of eight years for unpermitted disposal and six years for unpermitted storage.

The court of appeals reversed both Respondents' convictions for unpermitted disposal, concluding that they were barred by the statute of limitations.[3] *People v. Thoro Products Co., Inc.,* 45 P.3d 737 (Colo.App. 2001). The statute of limitations, section 25–15–308(4)(a), provides that criminal charges must be brought within two years after discovery of the violation or within five years after the date on which the alleged violation occurred, whichever date occurred earlier. Respondents argued that the last act of disposal occurred no later than 1985, and that therefore the prosecution was barred. The People countered that the definition of "disposal" in the statute is broad enough to encompass the passive migration of waste in the soil or groundwater. Although Thoro's handling of the solvents had ceased, they were still "disposing" of hazardous waste because the waste continued to seep through the soil on their property. The court of appeals agreed with the Respondents and reversed their convictions.

We granted certiorari on the question of whether the passive migration of previously leaked or spilled hazardous solvents constitutes "disposal" under section 25–15–310, 8 C.R.S. (2002).

## II. ANALYSIS

Respondents were convicted of unpermitted disposal of hazardous waste in violation of section 25–15–310(1)(b), 8 C.R.S. (2002). That section provides:

> On or after [November 2, 1984], no person shall ... [t]reat, store, or dispose of any hazardous waste identified or listed pursuant to this article ... without having obtained a permit as required by this article....

An act of disposal is defined to include:

> ... the discharge, deposit, injection, dumping, spilling, leaking, or placing of any

Thoro did, in fact, handle Dow solvents through at least 1985.

**3.** The court of appeals also concluded that the trial court erred in sentencing Mr. Newman above the authorized statutory range for his conviction for unpermitted storage of hazardous waste. The court reversed the sentence and remanded for re-sentencing. 45 P.3d at 747–49. This part of the court's ruling is not before us.

hazardous waste into or on any land or water so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

§ 25–15–101(3), 8 C.R.S. (2002).

Criminal charges under this statute must be brought "within *two years* after the date upon which the department [of public health and environment] discovers an alleged violation ... or within *five years* after the date upon which the alleged violation occurred, whichever date occurs *earlier* ..." § 25–15–308(4)(a), 8 C.R.S. (2002) (emphasis added). Because it would be the first to run in this case, only the five-year limitation period is relevant here.

We hold, after considering various tools of statutory construction, that the General Assembly did not manifestly indicate its intent to include passive migration of waste within the meaning of "disposal." Relying on the rule of lenity, we conclude that Respondents' failure to remediate the contaminated soil and prevent the passive migration of previously spilled waste did not constitute a continuing crime such that Respondents remain subject to the possibility of criminal charges twelve years after the last affirmative act of disposal.

■ First, we discuss the doctrine of continuing offenses and note that the General Assembly did not explicitly declare that unpermitted disposal of hazardous waste should be construed as a continuing offense. Nonetheless, a crime may be a continuing offense if the nature of the offense indicates that the legislature "must assuredly have intended" it be treated as one. *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).

Next, we consider the meaning of "disposal" to determine whether the legislature intended unpermitted disposal to constitute a continuing offense. We conclude that the plain language of the statute does not answer the question.

We then consider the underlying purposes of the statute as a whole, and more specifically, the purpose of the applicable statute of limitations. We conclude that an examination of the competing policy interests reflected in the statute does not answer the question of whether the legislature intended that unpermitted disposal be deemed a continuing offense.

We further review the interpretation of "disposal" provided by various federal courts but ultimately conclude that since none of them consider the meaning of "disposal" in the context of a criminal statute of limitations, their analysis is unhelpful.

Finally, because we are unable to determine whether the General Assembly intended the passive migration of waste to constitute the crime of unpermitted disposal, we conclude, under the rule of lenity, that the Respondents did not have adequate notice that their failure to remediate previously spilled waste would result in the possibility of criminal charges.

## A. The Statute of Limitations and the Doctrine of Continuing Crimes

■ To decide the applicability of the statute of limitations, we must determine when the alleged violation—unpermitted disposal of hazardous waste—occurred. Normally, a statute of limitations begins to run when the crime is complete; when all its substantive elements have been satisfied. *See* Wayne R. LaFave, et al. 4 *Criminal Procedure* § 18.5(a) (2d ed.1999). In this case, all the elements of the crime were satisfied at the moment Thoro's employees knowingly allowed solvents to spill into the soil without first obtaining a permit.

However, in certain circumstances, a crime continues beyond the first moment when all its substantive elements are satisfied. *See Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970); *United States v. De La Mata,* 266 F.3d 1275, 1288 (11th Cir.2001) ("A continuing offense is one which is not complete upon the first act, but instead continues to be perpetrated over time."); 21 Am.Jur.2d *Criminal Law* § 513 (1998) ("[A] continuing offense is a continuous, unlawful act or series of acts set in motion by a single impulse and operated by an unintermittent force...."). In such a

continuing offense, the crime continues (and the statute of limitations does not begin to run) so long as the illegal conduct continues. *See* § 16–5–401(4), 6 C.R.S. (2002) ("When an offense or delinquent act is based on a series of acts performed at different times, the period of limitation prescribed by this code starts at the time when the last act in the series of acts is committed.").[4] We have found no relevant case in which the doctrine of continuing offenses has been applied to impose criminal penalties for the unpermitted disposal of hazardous waste.[5]

Because there is "tension between the purpose of a statute of limitations and the continuing offense doctrine," the Supreme Court has cautioned that "the doctrine of continuing offenses should be applied in only limited circumstances." *Toussie*, 397 U.S. at 115, 90 S.Ct. 858 (holding the failure to register for the draft was not a continuing offense and the five-year statute of limitations began to run five days after defendant's eighteenth birthday). The Court further advised that, because the limitation of actions is a matter of legislative policy, it would not find a continuing offense unless "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.* Although we need not follow the Supreme Court's analysis in *Toussie*, we are persuaded that it provides an appropriate framework for analyzing the doctrine of continuing offenses. *See State v. Legg*, 9 S.W.3d 111 (Tenn.1999) (adopting the *Toussie* analysis for continuing offenses in Tennessee).

Using *Toussie* as a backdrop for our analysis, we first note that Colorado's statute contains no explicit language which compels us to conclude that the unpermitted disposal of hazardous waste is a continuing offense. This absence of explicit language is notable. For example, when the General Assembly defined the crime of conspiracy, it specifically declared that the crime was a "continuing course of conduct" which ends only upon completion of the crime or the abandonment of the agreement. § 18–2–204(1), 6 C.R.S. (2002). If the General Assembly intended to create a continuing offense in this case, it knew the sort of language it could include to unmistakably communicate this intent.

 Nonetheless, as noted in *Toussie*, a crime may be deemed a continuing offense if the "nature of the crime" is such that the General Assembly "must assuredly have intended" it be treated as such. *See Toussie*, 397 U.S. at 115, 90 S.Ct. 858. Therefore, the outcome of this case depends on whether the General Assembly intended the crime of unpermitted "disposal" to include the passive

---

**4.** The most frequently cited example of a continuing offense is conspiracy. *See United States v. Jaynes*, 75 F.3d 1493, 1505 (10th Cir.1996) ("Conspiracy … is the prototypical continuing offense."). In addition to conspiracy, various other offenses have been categorized as continuing offenses. *See, e.g., United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (escape); *United States v. Denny–Shaffer*, 2 F.3d 999 (10th Cir.1993) (kidnapping under the federal statute); *United States v. Martinez*, 890 F.2d 1088 (10th Cir.1989) (failure to appear); *People v. Martinez*, 37 Colo.App. 71, 543 P.2d 1290 (1975) (larceny is a continuing crime and every asportation constitutes a new taking).

**5.** The cases cited by the People are inapplicable. First, in *United States v. White*, 766 F.Supp. 873 (E.D.Wash.1991) the defendant was charged with unpermitted *storage* of hazardous waste, rather than unpermitted disposal. As the court in *White* concluded, there can be "little doubt" that the crime of unpermitted storage is a continuing offense. *Id.* at 887. The nature of the offense—storage—is such that any other interpretation would be illogical.

Second, in *State v. Brothers*, No. 2001–Ohio–8725, 2001 WL 1602692 (Ohio Ct.App. Dec. 14, 2001), the defendant allegedly buried drums of hazardous waste on his property from 1991 to 1997. Indicted in 1999, defendant argued that the crime of illegal disposal of waste was barred by the five-year statute of limitations. *Id.* at *1. The court disagreed, specifically noting that the drums were continuously leaking through 1997. *Id.* at *2. It was this leaking from the drums into the soil which was the "continuous" disposal for which defendants were charged. The court made no reference to any underground passive migration as is the case here.

In fact, the only criminal case we have found which considered this precise issue agreed with the analysis of the court of appeals. *See L.B. Foster Co. v. State*, Nos. 01–01–00299–CR & 01–01–00300–CR, 106 S.W.3d 194, 2003 WL 1563989 (Tex.Ct.App. Mar. 27, 2003).

migration of previously spilled hazardous solvents.[6]

## B. The Meaning of "Disposal"

In the People's view, the definition of "disposal" includes the passive migration of solvents through the groundwater. Although the Respondents have not placed any solvents into the ground since 1985, the People assert that the Respondents are continuing to "dispose" of the chemicals because the spilled solvents are still seeping through the soil.

On the other hand, Respondents contend that "disposal" includes only an affirmative act of disposal. Thus, they argue the initial spilling of solvents onto the soil was "disposal," but any subsequent seeping of the chemicals was not.

### 1. Plain Language

The first step in any statutory interpretation is an examination of the plain language of the statute itself. *People v. Norton*, 63 P.3d 339 (Colo.2003). The statute defines disposal broadly:

> "Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

§ 25–15–101(3), 8 C.R.S. (2002). The People embrace the word "leaking" as evidence that the legislature "must assuredly have intended" that unpermitted "disposal" includes passive migration and therefore constitutes a

continuing offense. *Toussie*, 397 U.S. at 115, 90 S.Ct. 858. We disagree.

First, the plain meaning of "leaking" does not support the People's interpretation. We have frequently looked to the dictionary to ascertain the meaning of undefined words in a statute. *See People v. Forgey*, 770 P.2d 781, 783 (Colo.1989). The most common definition of "leak" is "to enter or escape through a hole, crevice, or other opening." Websters Third New International Dictionary 1285 (1986). This definition connotes the movement of the substance out of its containment through some opening. Here, the waste is not contained.

If the General Assembly intended to insert a word into the definition of disposal to describe the passive migration of underground waste, we can think of many more likely candidates than "leaking." For example, words such as "oozing," "percolating," "migrating," or "seeping," would all provide a more exact description of that event. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir.2001). None of these were included in the definition.

The more likely reason for the inclusion of "leaking" in the definition is to address a situation in which waste was allowed to accidentally or negligently escape from its containment, such as a barrel or drum, or, as was the case here, from defective hoses or pumps. *See United States v. Waste Industries*, 556 F.Supp. 1301, 1306 (D.N.C.1982).

Next, an examination of the other descriptive words in the same statute belies a passive migration interpretation of the term

---

**6.** The People contend that Respondents' failure to obtain a permit, rather than the act of disposal, was the ongoing criminal conduct. In their view, the Thoro plant was a "disposal facility," which is defined in the regulations to include any "facility ... at which hazardous waste is intentionally placed into or on any land or water...." Rule 260.10, 6 C.C.R. 1007–3 (2001). The owners and operators of such facilities "must have permits during the active life (including the closure period) of the unit." Rule 100.10, 6 C.C.R. 1007–3 (1999). This permit requirement continues throughout the active life of the disposal facility until the department of public health and environment receives certification of final closure. Rule 260.10, 6 C.C.R. 1007–3 (1999) (defining "active life" of a facility).

The People's reliance on the permit requirements in the regulations begs the question. It is clear that Respondents did not obtain the necessary permits. However, this failure does not automatically trigger criminal liability. The crime of unpermitted disposal of hazardous waste has essentially three elements. To be convicted, a defendant must 1) knowingly 2) dispose of hazardous waste 3) without a permit. The failure to obtain a permit is merely one element. The People must still show that Respondents— within the five years prior to their indictment— were "disposing" of hazardous waste. Therefore, the outcome of this case depends on the meaning of the term, "disposal."

"leaking." The meaning of an undefined word in a statute may be determined by reference to the meaning of words associated with it. *See State v. Hartsough,* 790 P.2d 836, 838 (Colo.1990). Six of the seven words in the statute, "discharge," "deposit," "injection," "dumping," "spilling," and "placing," all describe an affirmative act by one or more individuals. That is, someone must discharge, deposit, inject, dump, spill, or place waste into or on any land or water. That leaves "leaking" as the only word which could arguably be subject to a passive interpretation. However, "leaking" may just as easily be subject to an active interpretation; it may be used to describe a way in which an individual could introduce waste into the environment. For example, the accidental or negligent release of solvents from defective hoses and pumps may be described as "leaking." While the word does not necessarily describe intentional conduct, it nonetheless describes an affirmative act of disposal. The fact that six of the seven words in the statute are subject only to an active interpretation lends support to the argument that "leaking" should also be given a similarly active interpretation.

We conclude that the plain language of the statute does not answer the question of whether the legislature intended that unpermitted disposal be deemed a continuing offense. Therefore, we next consider the legislative purpose and policies underlying the statute.

### 2. Legislative Purpose

Initially we note that traditional sources of legislative history have proven unhelpful in this case. The parties do not cite, and our own research has not uncovered, any relevant piece of legislative history on the meaning of "disposal" under the Colorado statute. In addition, the federal statutes which form the foundation of Colorado's hazardous waste management system are similarly uncooperative in yielding useful legislative history on the meaning of "disposal." Therefore, the parties attempt to decipher the intent of the legislature by reference to their view of the purpose and policy underlying the statute's various provisions.

The People argue that a passive migration interpretation of disposal is consistent with the legislative intent of ensuring the protection of the environment from the adverse effects of illegally disposed hazardous waste. On the other hand, Respondents argue that a passive migration interpretation of disposal thwarts the General Assembly's intent to limit the use of criminal punishment to only recent violators of the act.

The hazardous waste management system in Colorado was created to "ensure protection of public health and safety and the environment." Part 260, *Statement of Basis and Purpose,* 6 C.C.R. 1007–3 (1995). The criminal penalties contained in the statute play a role in this scheme by deterring and punishing the unpermitted transportation, storage, and disposal of hazardous waste.

We acknowledge that an interpretation of disposal which excludes passive migration may indeed make it more difficult to bring criminal charges under the disposal portion of section 25–15–310. Because of the slow movement of waste in the groundwater, the crime may not be discovered until many years after the last affirmative act of disposal. Violators are given an incentive, therefore, to remain silent regarding their crimes and avoid prosecution.

The People, however, overstate the magnitude of this problem. First, an offender who intentionally conceals his unlawful disposal will still be subject to prosecution. *See* § 25–15–308(4)(a), 8 C.R.S. (2002) (providing that the statute of limitations is tolled for any period during which a violator intentionally conceals his misconduct). In addition, even if the potential for civil fines or criminal liability is barred, the department of public health and environment still has the authority to issue an order requiring remediation of the site, so long as the order is issued within two years after discovery of the violation. *See* § 25–15–308(4)(b), 8 C.R.S. (2002).

While there is a risk that an offender will conceal his misdeeds in the hopes of avoiding prosecution, this is no less a risk here than it would be in every criminal case in which a statute of limitations exists. Nonetheless, the General Assembly saw fit to

include a statute of limitations for this crime. This reflects a policy choice made by the legislature to which we must defer. The purpose of a statute of limitation is to protect individuals from defending themselves against stale criminal charges, to prevent punishment for acts committed in the remote past, and to "insure that the accused will be informed of the decision to prosecute and the general nature of the charge with sufficient promptness to allow him to prepare his defense before evidence of his innocence becomes weakened with age." *Higgins v. People,* 868 P.2d 371, 373 (Colo.1994) (quoting Wayne R. LaFave & Jerold H. Israel, 2 *Criminal Procedure* § 18.5(a) (1984)). Thus, the statute provides predictability "by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). For these reasons, criminal statutes of limitations generally should be construed liberally in favor of the defendant. *People v. Midgley,* 714 P.2d 902, 904 (Colo.1986); *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).

By extending into perpetuity the period of time during which criminal charges may be brought, the People eviscerate the purpose of the statute of limitations. Under the People's interpretation of "disposal," the five-year statute of limitations will not begin to run until one of two events occurs: 1) a permit is obtained in accordance with the regulations, or 2) the waste is no longer "leaking"—either because it has been cleaned up, or because there exists a natural barrier to its movement. In practice, an offender would be forced to admit his wrongdoing to a government agency (in order to obtain a permit), or hope that the geological composition of the land is such that passive migration of the waste is precluded. This could not have been the scheme the legislature intended when it created a statute of limitations for the unpermitted disposal of hazardous waste.

In summary, this case presents two competing policy interests. On the one hand, a passive migration interpretation of disposal would seem to more fully implement the legislative intent of ensuring protection of the environment. However, that interpretation thwarts the General Assembly's intent to limit the time during which criminal charges may be brought. Thus, we conclude that an analysis of the statute's purposes does not answer the question of whether the legislature intended that unpermitted disposal be deemed a continuing offense.

### 3. Federal Interpretation

Next, the parties urge us to look to the federal courts for assistance in discerning the meaning of "disposal." However, our review of federal law in this area reveals only that the interpretation of "disposal" adopted by federal courts tends to be quite fact and context specific. Because none of the cases cited by the parties consider the meaning of "disposal" in the context of a criminal statute of limitations, we do not assign significant weight to their analysis.

### a. RCRA

The People rely primarily on federal cases interpreting "disposal" under the Resource Conservation and Recovery Act of 1976 (RCRA). 42 U.S.C. § 6901 to 6992k (1995). The state statute at issue here was derived in large part from RCRA and was intended to create a hazardous waste management program in Colorado which is similar to its federal counterpart. However, there is one notable difference between the two statutes. The Colorado statute contains a specific statute of limitations while RCRA contains no comparable provision. Instead, actions under RCRA are limited only by the more general five-year federal statutes of limitations. *See* 18 U.S.C. § 3282 (federal criminal offenses); 28 U.S.C. § 2462 (civil actions). While it is true that most RCRA cases have interpreted "disposal" to include passive migration, none have done so in the context of a criminal statute of limitations.

Most of the RCRA cases have arisen in one of two contexts. The first type of case involves a "citizen suit" under section 7002 of RCRA. 42 U.S.C. § 6972. That section authorizes "any person" to bring a civil action against "any person ... who is alleged to be in violation" of a RCRA permit, regulation or

standard. 42 U.S.C. § 6972(a)(1)(A) (1995). In order to bring a suit under section 7002, plaintiffs must first show that there is a "continuous or intermittent violation" of the statute. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 58–59, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (holding that the "to be in violation" language in the Clean Water Act requires a showing of an ongoing or intermittent violation); *Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498, 1511 (E.D.Wis.1992) (noting that "every court that has analyzed [RCRA] section 7002 in the wake of *Gwaltney* has concluded that an allegation of either a continuous or intermittent violation is required").

Several courts have been asked to decide whether the passive migration of previously dumped waste constitutes an ongoing violation of the statute in these citizen suit cases. Most conclude that it does. *See Fallowfield Dev. Corp. v. Strunk*, 1990 WL 52745, at *10 (E.D.Pa.1990) (The prior disposal of waste is an ongoing violation "until the proper disposal procedures are put into effect or the hazardous waste is cleaned up."); *City of Toledo v. Beazer Materials and Servs., Inc.*, 833 F.Supp. 646, 656 (N.D.Ohio 1993) (same); *Acme Printing Ink Co.*, 812 F.Supp. at 1512 ("leaking of hazardous substances may constitute a continuous or intermittent violation"); *but see Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305 (2d Cir.1993) (no present violation under RCRA section 7002 for the "mere decomposition of pollutants").

The second situation in which RCRA cases typically address "disposal" is in the context of a remediation action brought by the EPA under RCRA section 7003. This section grants broad equitable powers to the EPA to seek injunctive relief restraining further violation of the Act where there is an "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6973(a). Several courts have been asked to determine whether an inactive disposal site, where no affirmative acts of disposal are occurring, may constitute an "imminent and substantial endangerment." Once again, most courts accept a passive definition of "disposal" in this context. *See United States v. Price*, 523 F.Supp. 1055, 1071 (D.N.J.1981), *aff'd United States v. Price*, 688 F.2d 204 (3rd Cir.1982) (holding that section 7003 authorizes relief restraining further "leaking" of waste from a landfill but noting that section 7003 does not authorize a general cleanup of dormant waste sites); *United States v. Waste Indus.*, 734 F.2d 159 (4th Cir.1984) (noting that section 7003 restrains more than just ongoing human conduct); *United States v. Diamond Shamrock Corp.*, No. C80–1857, 12 Envtl. L. Rep. 20819, 20821, 1981 WL 137997 (N.D.Ohio May 29, 1981) (noting that "a disposal clearly requires no active human conduct"); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 200 (D.Mo.1985) (" 'disposal' occurs ... when [wastes] migrate from their initial location"); *but see United States v. Wade*, 546 F.Supp. 785 (E.D.Pa.1982) (noting in dicta that leaking of previously dumped waste does not constitute "disposal").

In addition, one notable case, relied on by the People, was not brought under either section 7002 or 7003. *See United States v. Power Eng'g Co.*, 10 F.Supp.2d 1145 (D.Colo. 1998), *aff'd* 191 F.3d 1224 (10th Cir.1999). In *Power Engineering*, the issue was whether the EPA could, under section 3008 of RCRA, enjoin a defendant, the operator of a metal refinishing plant, to enforce state regulations. *See* 42 U.S.C. § 6928. Specifically, the EPA sought compliance with state regulations requiring financial assurances from owners and operators of hazardous waste facilities requiring them to document that they have sufficient resources to close their facilities and pay third-party claims that may arise. Defendants argued that since they were not currently disposing of waste, they were operating in compliance with state regulations and exempt from financial assurance requirements. The court disagreed. It held that the use of the word "leaking" in the definition of "disposal" indicated that the leaching of hazardous waste into the groundwater constitutes continuing disposal of hazardous waste. *Id.* at 1159–60. In so holding, the court was particularly concerned that allowing the defendant to be exempt from the financial assurance requirements would encourage others to evade or ignore the permit requirements of RCRA. *Id.* at 1162.

### b. CERCLA

The definition of "disposal" has been interpreted much differently under another piece of federal legislation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). 42 U.S.C. §§ 9601 to 9675 (1995). The definition of "disposal" under CERCLA is identical to the definition of the term under RCRA. 42 U.S.C. § 9601(29). However, CERCLA, unlike RCRA, was created as a solution to the problem of old and abandoned waste sites. Its focus is, by its very nature, remedial. The statute provides for potential liability for any person "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Many courts have been confronted with the question of whether the owner of a property on which the passive migration of waste is occurring is an owner "at the time of disposal." Most courts to consider this issue have concluded that disposal does not include the passive migration of waste. *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351 (2d Cir.1997) (prior owners are not liable under CERCLA for passive migration); *United States v. CDMG Realty Co.*, 96 F.3d 706 (3rd Cir.1996) (citing the plain language of the definition of disposal in concluding that disposal does not include passive migration); *United States v. 150 Acres of Land*, 204 F.3d 698 (6th Cir. 2000) (noting that "spilling" and "leaking" in the definition of disposal should be interpreted actively); *Carson Harbor Vill. Ltd. v. Unocal Corp.*, 270 F.3d 863, 879 n. 7 (9th Cir.2001) (noting that "[n]othing in the context of [CERCLA] or the term 'disposal' suggests that Congress meant to include chemical or geological processes or passive migration"); *United States v. Petersen Sand and Gravel, Inc.*, 806 F.Supp. 1346 (N.D.Ill. 1992) (meaning of "disposal" determined in conjunction with the meaning of the statutory term "release" indicates that disposal does not include passive migration); *Redwing Carriers, Inc. v. Saraland Apartments, Ltd.*, 875 F.Supp. 1545 (S.D.Ala.1995) (same); *but see Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir.1992) (passive leaking of waste from tanks may constitute disposal under CERCLA).

While it is difficult to derive significant insight from this brief overview of federal law, one fact becomes apparent: the meaning affixed to "disposal" under RCRA and CERCLA depends less on the precise language of the definition and more on the specific facts and equities of each particular case and the context of the statute under which the term was interpreted.

None of the cases cited by the People or the Respondents involve the situation we confront here: the application of a statute of limitations on potential criminal prosecution. Therefore, we do not assign significant weight to the interpretation of "disposal" provided by the federal courts.

### C. The Rule of Lenity

It is axiomatic that criminal law must be sufficiently clear such that a citizen will know what the law forbids. *See People v. Heckard*, 164 Colo. 19, 431 P.2d 1014 (1967). For this reason, ambiguity in the meaning of a criminal statute must be interpreted in favor of the defendant under the rule of lenity. *People v. Lowe*, 660 P.2d 1261 (Colo.1983).

The rule of lenity should not be applied to defeat the evident intent of the General Assembly. *Terry v. People*, 977 P.2d 145 (Colo.1999). However, if after utilizing the various aids of statutory construction, the General Assembly's intent remains obscured, the rule of lenity should be applied to resolve the ambiguity. *See Muscarello v. United States*, 524 U.S. 125, 138, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) ("[t]he rule of lenity applies only if, after seizing everything from which aid can be derived, ... we can make no more than a guess as to what Congress intended") (internal quotations omitted); *United States v. Wilson*, 10 F.3d 734, 736 (10th Cir.1993) ("The rule of lenity is a rule of last resort, to be invoked only after traditional means of interpreting the statute have been exhausted.").

On numerous occasions, this court has found a genuine ambiguity in a criminal statute and adopted the interpretation which fa-

vors the accused. *See, e.g., Fields v. Suthers,* 984 P.2d 1167 (Colo.1999) (holding that even if statutory term was subject to alternative interpretations, the rule of lenity requires that pre-sentence confinement credit be taken into account to determine when twenty year period for parole eligibility accrued); *People v. Glover,* 893 P.2d 1311 (Colo.1995) (because statutes were ambiguous, application of the rule of lenity requires that a defendant may not be convicted of felony murder and murder after deliberation where there was only a single victim); *Faulkner v. Dist. Court,* 826 P.2d 1277 (Colo.1992) (where statutory language lent itself to alternate constructions, application of the rule of lenity requires that a defendant who received a jail term as a condition of probation would still be eligible for good time credit).

In this case, the plain language of the statute, the apparent legislative policies underlying the statute, and the various federal interpretations of the term "disposal," do not provide a clear answer to the question presented herein, namely, whether the legislature intended the passive migration of waste to constitute the crime of unpermitted "disposal" of hazardous waste. We therefore conclude that the Respondents did not have adequate notice of the conduct the statute was intended to prohibit; specifically, the Respondents did not have notice that their failure to remediate contaminated soil and prevent the passive migration of previously spilled waste would constitute a continuing crime such that they would be subject to the possibility of criminal charges twelve years after the last affirmative act of disposal. Based on the rule of lenity, we accordingly construe this ambiguity in favor of the Respondents and hold that their prosecution is barred by the statute of limitations.[7]

### III. CONCLUSION

■ For the foregoing reasons, we cannot conclude that the legislature intended "disposal" to include the passive migration of previously leaked or spilled waste for the purposes of the criminal statute of limitations

provision contained in section 25–15–308(4)(a). Because the last affirmative act of disposal occurred more than five years before Respondents' indictment, we hold that their prosecution was barred by the statute of limitations. The judgment of the court of appeals is affirmed.

Justice HOBBS concurs.

Justice BENDER dissents, Chief Justice MULLARKEY and Justice MARTINEZ join in the dissent.

Justice HOBBS, concurring:

I concur in the opinion and judgment of the court. In view of the People's predictions of dire impact upon the State's hazardous waste laws and program—were we to uphold the judgment of the court of appeals—I explain my view that that the judgment of the court announced today addresses only the General Assembly's intent in the adoption of section 25–15–308(4)(a) & (b), 8 C.R.S. (2002), the statute of limitations provisions, as they apply to criminal prosecutions for violation of Colorado's hazardous waste laws.

In my view, the difference between depriving a person of his or her liberty and/or imposing criminal fines for violation of the state's hazardous waste laws, and requiring the person to perform remediation of a hazardous waste spill, is manifest on the face of the statute and supported by application of criminal versus civil law principles.

Ordinarily, except for certain crimes specified in section 16–5–401(1)(a), 6 C.R.S. (2002), the criminal law does not operate to allow criminal prosecution many years after the accused engages in the proscribed act; as the opinion of the court expresses, the rule of lenity operates in favor of a criminal defendant against a "continuous violation" reading of an ambiguous criminal statute of limitations absent a specific or necessarily implied legislative intent to the contrary. On the other hand, civil liability in hazardous waste cases under Colorado's law extends to requir-

---

**7.** Our decision is based on the rule of lenity, a doctrine which is inapplicable to civil proceedings. We therefore express no opinion on the meaning of the term "disposal" in any context other than a criminal prosecution.

ing remediation when soil or ground water contamination is discovered many years after an unpermitted hazardous waste spill has occurred.

The case before us involves the spilling of hazardous waste that occurred earlier than 1986 and a criminal prosecution and conviction that were obtained in the late 1990s. After the spilling occurred, the hazardous waste migrated into the soil and into groundwater.

Section 25–15–308(4)(b), 8 C.R.S. (2002), of the statute of limitations provision at issue in this case, provides that the State of Colorado Department of Health and Environment (Department) may issue a civil remediation order to rectify the results of such a spill, even though section 25–15–308(4)(a), 8 C.R.S. (2002), would bar criminal punishment. Under section 25–15–308(4)(b), 8 C.R.S. (2002), the Department:

> within two years after the date upon which the department discovers such disposal, may issue an order ... requiring action to remediate such disposal. *The department is not authorized under these circumstances to seek any administrative, civil, or criminal penalties for such disposal of hazardous waste.* (emphasis added).

In my view, this provision specifically answers the question before the court in this appeal: may the defendant be punished criminally for unpermitted acts of spilling hazardous waste that occurred prior to 1986? The People argue that the answer is "yes" on the basis that every day the spilled hazardous waste exists in the environment constitutes a new criminally punishable event. In doing so, the People largely ignore the General Assembly's authorization for a civil remediation order within two years after the date the State of Colorado learns of the presence of the hazardous waste in the environment resulting, for example, from an unpermitted spill or leak from materials handling, as occurred in the case before us.

The General Assembly is quite clear in section 25–15–308(4)(b), 8 C.R.S. (2002), that criminal penalties do not apply in connection with the issuance of a civil remediation order in the circumstances of a case like the one before us—that is, when the migration of the spilled material through the soil into ground water is discovered many years after the criminally punishable unpermitted acts of disposal occurred. By characterizing the crime as consisting of each day the hazardous waste exists in the environment, the People seek to impose criminal liability despite the prohibition in section 25–15–308(4)(a) & (b), 8 C.R.S. (2002), on criminal punishment when the limitation period has run, and the authorization in section 25–15–308(4)(b), 8 C.R.S. (2002), for civil remedial orders in such circumstances.

In my view, the General Assembly has addressed, resolved, and avoided the very specter the People raise—the specter that the court of appeals judgment in this case will prevent or severely restrict the State of Colorado from requiring remediation of unpermitted spills. In making this argument, the People ignore the apparent intent of the General Assembly in providing that the Department may require the clean-up of contaminated soil and ground water under the statute long after the unpermitted spills occurred. The General Assembly also provided that the People may not prosecute acts of spilling that occurred more than five years before charges in the case were filed, because the provisions of section 25–15–308(4)(a), 8 C.R.S. (2002), bar such a prosecution (providing that a criminal prosecution may be brought within two years after the date the Department discovers an alleged violation or within five years after the date the violation occurred, "whichever date occurs earlier"). Read in combination, these provisions evidence a clear legislative public policy that we should uphold, giving effect to both provisions.

In the case before us, the unpermitted spill occurred more than five years before the initiation of the criminal prosecution. I conclude that the General Assembly intended to make persons criminally responsible for unpermitted spills of hazardous wastes occurring after the effective date of Colorado's hazardous waste act, November 2, 1984, *see* section 25–15–102(3), 8 C.R.S. (2002), but barred prosecution of spills that occurred five years before the criminal filing. At the same time, the General Assembly provided for civil

remediation orders to be issued long after the hazardous waste spills, so that injurious effects upon the environment would be rectified.

Our recent decision in *Hoery v. United States*, 64 P.3d 214 (2003), which I joined, imposes continuous tort liability in a case such as the one before us here. Alternatively, or in combination, Department remediation orders under the hazardous waste act and tort liability for soil and ground water contamination address the pernicious effect of unpermitted hazardous waste spills that the dissent rightly decries. Criminal punishment for each day hazardous waste exists in the environment until the contamination is completely cleaned up is not what the General Assembly intended.

In conclusion, I do not ascribe to the carefully written opinion of the court affirming the judgment of the court of appeals any effect other than a statute of limitations restriction on the People bringing criminal prosecutions under the hazardous waste laws. The opinion's discussion is entirely in the context of the facts applicable in this case—that is, that the prosecution was brought and criminal punishment imposed, illegally, for hazardous waste spills that occurred more than five years before the criminal filing occurred. To the extent that the court's discussion of "disposal" is read to extend beyond the narrow context of criminal prosecution and punishment, I disagree. I do not believe that the court's judgment extends that far, and I do not join in a judgment that would have such effect.

Accordingly, I join in the opinion and judgment of the court that the criminal convictions for illegal disposal of hazardous waste in this case resulted from a time-barred criminal prosecution. It follows that the judgment of the court of appeals must be affirmed.[1]

Justice BENDER, dissenting:

In this case, the defendant company and one of its officers leaked and spilled thousands of pounds of poisonous chlorinated sol-

vents, including Tetrachloroethene (PCE), Trichloroethene (TCE), 1,1,1, Trichloroethane (TCA), and Methylene Chloride into the ground, creating an underground plume of deadly pollutants extending one mile long and two hundred feet wide which continues to contaminate the soil and underground water table within a mile of the company's facility. Such enormous environmental damage took years to build up and longer for the government to detect. Aware of the nature of the environmental harm caused by the land disposal of hazardous wastes, the General Assembly passed broad and sweeping legislation aimed at preventing such future deadly pollution and punishing civilly and criminally those who failed to follow its regulatory regime which mandates that those who dispose, store, or treat hazardous waste will be responsible for such waste until it no longer poses a threat to human health or the environment.

The majority, by its narrow construction of the term "disposal" to mean only the initial act of disposal and not the continued accumulation of the toxic pollutants into the environment that is still occurring today in 2003, cripples the broad legislative mandates of Colorado's Resource Conversation and Recovery Act ("RCRA").

By misapplying *Toussie v. United States*, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) and the doctrine of continuing offenses, the majority unnecessarily resorts to the rule of lenity and creates ambiguity where none exists. Under a *Toussie* analysis, the language of RCRA and the nature of defendants' crime of knowingly spilling and leaking hazardous waste and allowing it to migrate unabated into drinking waters is such that the General Assembly intended it to be a continuing disposal violation. Thus, the public policy considerations of the statute of limitations—to encourage prompt investigation and to discourage the prosecution of stale crimes—are not present in this case where the migration of underground hazardous waste was unknowable for long periods

---

1. I recognize that defendant was convicted of separate incidents of hazardous waste storage without a permit and of criminal mischief; I intend nothing in this concurrence to suggest that those convictions were improper.

of time but now insidiously infects human health and the environment.

Because the definition of "disposal" and the statute of limitations under RCRA apply equally to civil and criminal actions, the majority's narrow interpretation eviscerates civil and criminal enforcement of RCRA, contrary to the statute's regimen, and arguably puts the state's authorization to enforce hazardous waste standards and the federal government's financial assistance for enforcement in jeopardy because Colorado's RCRA program is no longer equivalent to the federal RCRA program. Hence, I respectfully dissent.

I would hold that because the defendants' last "acts" of disposal continue to be perpetuated today, the defendants' conduct constitutes a continuing offense under RCRA. Because the defendants' disposal offense continued through the time of indictment and trial, and for that matter, continues today, their prosecution for illegally disposing of hazardous waste without a permit is not barred by the five-year statute of limitations.

## I. Background

To understand my conclusion that the current migration of toxic pollution from the defendants' site constitutes disposal under Colorado's RCRA statute, I provide a brief background of this case and the RCRA statutory scheme. In particular, I explain the general nature of underground pollution plumes, the purpose of Colorado's RCRA statute, as distinguished from CERCLA, that is designed to prevent the type of invasive and damaging harm that occurred here, and defendant Newman's knowledge that such harm could occur as a result of his actions and failure to act.

## A. Underground Pollution Plumes and the Statute Designed to Prevent Them: RCRA

The jury in this case found, by proof beyond a reasonable doubt, that the defendants knowingly and illegally leaked and spilled thousands of pounds of dangerous toxic chemicals without a permit.[1] Although the defendants knew that a substantial amount of the toxic chemicals seeped into the ground, at no point did they make any effort to clean-up, recover, or treat such spills. As a result, the toxins leaked through the soil and into the water table below. Subsequent testing revealed an underground pollution plume almost a mile long and hundreds of feet wide originating from the Thoro facility that contaminated a drinking water well used by a local restaurant less than a mile away from the facility. An EPA expert testified that a significant amount of the toxic chemicals spilled and leaked by the defendants currently remain in the soil underneath the Thoro site. Because there has been no clean-up or remediation of the soil, the pollution plume continues to migrate into the water table today.

Such a fact-pattern is typical of underground pollution cases. *See, e.g., United States v. Waste Indus. Inc.*, 734 F.2d 159 (4th Cir.1984); *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981). Like the instant case, the discovery of underground pollution plumes usually occurs in the following manner.

Local residents, as opposed to any governmental or public agencies, are typically the first to discover the pollution. Because of the underground nature of pollution plumes, local law enforcement or environmental agencies are not aware of any environmental hazard and thus have no reason to investigate. Instead, people notice a decline in the quality of their drinking water through foul color, taste, or smell or they suffer illnesses or side

---

1. For example, defendant Newman testified that railcars full of toxic chemicals sat on the rail spur at Thoro and leaked onto the ground. One such leaking railcar lost approximately half of its cargo of Methylene Chloride—approximately six thousand pounds. Newman and other Thoro employees also testified that a faulty pump used to transfer TCA to and from the storage tank leaked continuously for months. One employee stated that the pump leaked thousands of pounds of TCA. Even taking into account possible losses due to evaporation and residual chemicals left in railcars, there were substantial, unexplained losses. For instance, one set of Thoro reports showed that in 1979 Thoro lost six tons of TCA.

effects such as blisters, boils, and stomach distress attributable to their use of well water. In this case, a local restaurant less than a mile from the Thoro facility complained about the quality of the water originating from its drinking water well. Subsequent testing revealed that the drinking water well was contaminated with unsafe levels of TCE, TCA, PCE and Methylene Chloride.

Once significant and unsafe contamination levels are found, investigators follow the contamination "upstream" through the underground water flow to determine the source. Here, investigators followed the contamination from the restaurant's drinking water well through the underground water and determined that the source of the TCE, TCA, PCE and Methyl Chloride contamination was the Thoro facility.

When investigators determine the source of the contamination, groundwater hydrologists determine how the pollutants moved through the soil and how quickly they are moving once they reach the water table. Hydrologists study the distribution and characteristics of earth materials such as sand, clay, and solid rock that lie below the surface of the ground. Such characteristics can determine how the toxic chemicals move through this layer of materials below the ground surface to reach the "water table" or the flow of underground water. When the liquid toxins reach the water table, a region or plume of contamination begins. The plume follows the direction of the groundwater flow. The underground movement of the contaminated pollutants through the water table is slow but continuous.

In this case, for example, the EPA hydrologist testified that toxic chemicals in the soil at the Thoro facility—in concentration levels ten to a thousand times higher than levels considered safe for drinking water—were leaking into the water table and moving less than a foot a day through the underground water system. The pollutants emanating from Thoro took approximately twenty years

to reach the drinking water well at the Arvada restaurant. Thus, even though the last "act" of disposal at the Thoro facility occurred in 1985, the EPA hydrologists testified that pollutants spilled and leaked at that time continue to flow unabated through the water table and into drinking water wells. *See, e.g., Price,* 523 F.Supp. at 1061 (finding that although the last "act" of illegal disposal occurred in 1972, the hazardous waste continued to leak into the soil from the contamination site nine years later.). Individuals who drink water from these wells expose themselves to significantly increased risks of developing toxic conditions, cancer, and birth defects. *See, e.g., Waste Indus. Inc.,* 734 F.2d at 162 (high levels of chemicals such as TCA and TCE can pose unacceptably high risks of neurological damage in children and cancer in humans of any age).

To prevent just this type of invasive harm, the General Assembly passed RCRA, *see* §§ 25–15–301 to 25–15–327, 8 C.R.S. (2002), to "ensure protection of public health and safety and the environment." 6 C.C.R. 1007–3, Part 260, Statement of Basis and Purpose.[2] Colorado is authorized to enforce its own RCRA program only if it is consistent with the federal program. *See* 42 U.S.C. §§ 6901 to 6992k (2002)(federal RCRA program). Under the federal RCRA statutory scheme, states replace the EPA as the primary enforcement and permitting authority. *See* 42 U.S.C. § 6926(b)("Such State is authorized to carry out such program *in lieu of* the Federal program ... and to issue and enforce permits for the storage, treatment or disposal of hazardous waste ....")(emphasis added). In exchange for federal financial assistance, states enact hazardous waste laws that are equivalent to the federal RCRA program.[3] *Id.* Colorado's RCRA program became effective on November 2, 1984. § 25–15–102(3). Any action taken by the State of Colorado pursuant to its federally authorized hazardous waste program "shall have the same force and effect as action taken by the

---

**2.** *See also* 42 U.S.C. § 6902(a)(4)(2002)(primary purpose of federal RCRA program was to assure that "hazardous waste management practices are conducted in a manner which protects human health and the environment.").

**3.** *See* 6 C.C.R. 1007–3, Part 260 ("Such full state authorization to conduct the hazardous waste regulatory program can be granted only upon the determination that the State program is *equivalent* to that of the EPA.")(emphasis added).

[EPA]." *United States v. Power Eng'g Co.,* 10 F.Supp.2d 1145, 1148 (D.Colo.1998), *aff'd,* 191 F.3d 1224 (10th Cir.1999), *cert. denied,* 529 U.S. 1086, 120 S.Ct. 1718, 146 L.Ed.2d 640 (2000)(citing to 42 U.S.C. § 6926(d)). However, if the EPA determines that the state is not administering its program in accordance with the federal RCRA program, it is required to withdraw authorization from the state program. 42 U.S.C. § 6926(e).

To promote the proper management of hazardous waste, and thus reduce the need for corrective action in the future, RCRA strictly regulates any facility that "treats, stores, or disposes" of hazardous waste. § 25–15–303. The term disposal is one of the broadest terms in the statute (as compared to "treat" and "store") and includes:

> discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

§ 25–15–101(3).

Courts and commentators have determined that the nearly identical definition of "disposal" under the federal RCRA program is intended to have a range of meanings, including not only active conduct but also passive conduct such as the reposing of hazardous waste and its subsequent movement through the environment. *See, e.g., Waste Indus. Inc.,* 734 F.2d at 164–65; 1 James T. O'Reilly and Caroline B. Buenger, *RCRA and Superfund: A Practical Guide with Forms* § 2.5 (2d ed.2002). As the majority notes, the overwhelming number of federal courts have interpreted "disposal" in RCRA civil actions to include migration of underground wastes caused by defendants' improper disposal practices. *See, e.g., Power Eng'g Co.,* 10

F.Supp.2d at 1159 ("Because the definition of "disposal" includes the word "leaking," disposal occurs not only when ... hazardous waste is first deposited onto ground or into water, but also when such wastes migrate from their initial disposal location.").

RCRA's disposal requirements are considered "cradle to grave," because the hazardous waste management system regulates hazardous waste in perpetuity—from the point it is generated until it will no longer endanger human health or the environment.[4] Thus, all owners and operators of disposal facilities must comply with reporting, monitoring, and inspection requirements, follow only approved treatment, storage and disposal methods, and fulfill all permit requirements until the waste no longer poses a threat to human health or the environment. *See* 6 C.C.R. 1007–3, Part 100.

Consistent with RCRA's mandate of protecting human health and the environment, land disposal of hazardous waste is prohibited unless it can be shown that there will be no migration of such waste:

> [A] method of land disposal may not be determined to be protective of human health and the environment for a hazardous waste ... unless ... it has been demonstrated ... to a reasonable degree of certainty, that *there will be no migration* of hazardous constituents from the disposal unit ... for as long as the wastes remain hazardous.

42 U.S.C. § 6924(d)(1)(emphasis added).[5]

To prevent the migration of hazardous waste and thus to protect human health and the environment, RCRA imposes substantial civil and criminal penalties on those owners and operators who illegally dispose of hazardous waste without a permit. Although the state acts in lieu of the federal government to enforce RCRA and impose such

**4.** *See* Timothy E. Shanley, *Applying a Strict Limitations Period to RCRA Enforcement: A Toxic Concept with Hazardous Results,* 10 Pace Envtl. L.Rev. 275, 278 (1992).

**5.** *See also Hazardous Waste Treatment Council v. United States EPA,* 910 F.2d 974, 975 (U.S.App.D.C.1990)(holding that land disposal may be found "protective of human health and the environment" under RCRA only if the EPA

concludes that there will be "no migration of hazardous constituents from the disposal unit ... for as long as the wastes remain hazardous."); O'Reilly, *RCRA and Superfund: A Practical Guide with Forms* § 4:8 ("The few land disposal sites allowed to take untreated wastes will need to show that there will be no migration from the site of hazardous constituents, for as long as the wastes remain hazardous.").

penalties, private citizens may still bring "citizen suits" pursuant to the federal RCRA program to enforce the state's hazardous waste standards. *See Sierra Club v. Chemical Handling Corp.*, 824 F.Supp. 195, 197 (D.Colo.1993). The broad definition of disposal applies equally to civil and criminal RCRA actions.

Civilly, the Colorado Department of Public Health and the Environment acts in lieu of the EPA pursuant to federal legislation to enforce RCRA. It may impose penalties on owners or operators of hazardous waste facilities that illegally dispose of such waste without a permit. The Department can impose administrative fines of up to fifteen thousand dollars per day per violation. § 25–15–309(1). Or, in lieu of administrative penalties, the Department may seek a civil penalty of twenty-five thousand dollars per day per violation. *Id.* Persons subject to administrative or civil penalties under RCRA can mitigate those penalties if they had previously established a self-regularized and comprehensive environmental compliance program, and, as a result of such a program, voluntarily disclosed the existence of potential environmental hazards prior to the Department's knowledge and worked with the Department in good faith to remediate the hazards. *See* § 25–15–309(3)(f),(g),(h). The purpose of such "mitigating factors" is so that owners and operators who treat, store, or dispose of hazardous waste will voluntarily discover, properly disclose and expeditiously correct violations before they endanger human health and the environment. Irrespective of whether an administrative or civil order is entered, the Department is not precluded from referring the same disposal violation for criminal prosecution. § 25–15–309(2).

The State Attorney General enforces the criminal provisions. It is a felony to knowingly dispose of any hazardous waste without a permit. § 25–15–310(1)(b),(3). A court may sentence anyone found guilty of knowingly disposing of hazardous waste without a permit to pay a fine of not more than fifty thousand dollars for each day of violation, or by imprisonment not to exceed four years, or by both such fine and imprisonment.[6] § 25–15–310(3). Similar to civil actions, RCRA criminal violators can mitigate the severity of criminal penalties if they had a self-regulating environmental compliance program that allowed them to disclose voluntarily and remediate environmental hazards before posing a threat to human health and the environment. § 25–15–309(5)(f),(g),(h).

Both civil and criminal actions brought under RCRA are subject to the same statute of limitations. Any action under Colorado's RCRA requirements must commence within two years after the date upon which the Department discovers an alleged violation or within five years after the date upon which the alleged violation occurred, whichever date occurs earlier.[7] § 25–15–308(4)(a). If the state discovers a disposal violation that would be barred by the statute of limitations—*i.e.*, the site stopped "leaking" more than five years earlier—the state cannot impose any administrative, civil or criminal penalties for such a disposal violation but can order the violator to remediate the area and any consequences of such a hazardous waste leak if it does so within two years of discovery. § 25–15–308(4)(b).

RCRA, in both its purposes and enforcement regimen, is distinguishable from the Comprehensive Environmental Response

---

**6.** It is also a federal offense to knowingly dispose of any hazardous waste without a permit. 42 U.S.C. § 6928(d)(2)(A). A court may sentence such criminals to fines of fifty thousand dollars for each day of violation or imprisonment for up to five years. 42 U.S.C. § 6928(d).

**7.** The federal RCRA program does not have a statute of limitations for either civil or criminal actions. *See, e.g., Meghrig v. K.F.C. Western, Inc.*, 516 U.S. 479, 486, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). However, many courts have applied general statute of limitation provisions to federal

actions in both the civil context, *see* 28 U.S.C. § 2462 (five-year statute of limitation for civil actions); *Glazer v. American Ecology Envtl. Servs.*, 894 F.Supp. 1029, 1044 (E.D.Tex.1995), and the criminal context. *See* 18 U.S.C. § 3282 (five-year statute of limitation period for criminal proceedings); *United States v. White*, 766 F.Supp. 873, 886 (E.D.Wash.1991); *see generally*, Doris K. Nagel, *RCRA Enforcement and the Statute of Limitations*, 18 Envtl. L. Rep. 10431 (1988)(discussing both civil and criminal statute of limitations under RCRA).

Compensation and Liability Act.[8] §§ 25–16–101 to 25–16–310; 42 U.S.C. §§ 9601 to 9675. CERCLA has two broad remedial purposes: to facilitate the clean-up of hazardous waste sites and to ensure that those responsible for pollution pay the costs of clean-up. The first goal is accomplished by the establishment of the federal government's "Superfund" to pay for clean-up. To accomplish the second goal of making those responsible for pollution to pay the costs, CERCLA imposes strict liability on any persons who owned or operated property at the time of disposal of hazardous waste. 42 U.S.C. § 9607(a)(2). Unlike RCRA, CERCLA is a retroactive statute. CERCLA imposes strict liability and potentially responsible parties must pay for the clean-up but can sue for contribution from others. Unlike RCRA, CERCLA includes a defense for the "innocent landowner." This defense can be asserted if, at the time of purchase, the defendant did not know, and no reason to know, that hazardous waste was disposed of on the property. 42 U.S.C. § 9601(35)(A)(i). Unlike RCRA, CERCLA includes only civil enforcement. 42 U.S.C. § 9609.

## B. Defendant Newman's Knowledge of RCRA and Its Requirements

A jury found, beyond a reasonable doubt, that the defendants violated the criminal provisions of RCRA by knowingly disposing of hazardous waste without a permit. The record supports their conclusion that Defendant Newman was aware and knew about the consequences of spilling and leaking hazardous waste and the danger to human health and the environment by allowing them to migrate underground. Based on his work experiences, education, and training, Defendant Newman knew the technical process of proper disposal procedures and the strict requirements that RCRA imposed on those who disposed of hazardous waste so as to prevent the type of insidious migration that occurred here.

Defendant Newman was an integral part of Thoro's business during the time in which it continuously leaked and spilled tons of TCE, TCA, PCE and Methyl Chloride onto the ground. In the early seventies, during college, Newman worked summers at Thoro. After graduating from college in 1974, Newman started full-time at Thoro. He started as a "terminal operator," which involved learning the business of handling the toxic chemicals. Specifically, Newman was responsible for pumping the chemicals from the railcar to the storage tank and then pumping them from the storage tank to the trucks. As a terminal operator, Newman received specific instructions from Dow about how to handle the toxic and dangerous chemicals. In its written handling instructions, Dow cautioned Thoro about "spill, leak and disposal procedures." The procedures indicted that for small spills, Thoro should mop up, wipe up, or soak up the liquid immediately. For large spills, Dow instructed Thoro employees to contain the liquid, transfer it to a closed metal container, and to keep the contamination out of the water supply.

By 1978, Newman continued his role of terminal operator but also trained and assisted other employees as terminal operators. By late 1983, Newman was Vice–President of Thoro. According to a job description for Newman related to another Thoro site that had its RCRA permit, Newman's responsibilities were: (1) attending all school sessions, all classes, knowing all RCRA regulations and changes thereto;[9] (2) monitoring the site location and checking field conditions and reports; (3) physically inspecting the site with inspectors and agencies; (4) checking mechanics of operation, maintenance, and

---

**8.** The state is authorized to enforce the federal CERCLA program. *See* §§ 25–16–101, 25–16–103.

**9.** Thoro's "Continuing Education Policy" stated:

Like most regulations management anticipates that the Resource Conservation and Recovery Act (RCRA) will undergo many changes as conditions warrant them, and it will continue to be management's aim to maintain a high concern and a high degree of compliance with the changing scene.

In order to do this it is necessary that our operationsl [sic] personnel be educated and kept abreast of the state of the art. While we make all changes and other updated information available to each and every operations employee, we feel that it [sic] necessary that all of our people go off site to a seminar or a school as often as is possible and educational.

conditioning as well as interfaces with chemical operators; and (5) insuring proper safety equipment and protection gear procurement, operation, and maintenance. Consistent with its continuing education policies, Thoro reported that Newman received over fifty hours of RCRA training: sixteen hours of D.O.T. Training on Hazardous Materials Regulations; eight hours at a RCRA Regulatory Seminar; sixteen hours for Regulations for Terminal Operators; eight hours for an Environmental Hazards Seminar; and seven hours for a Seminar on Preparation of RCRA Applications.

As Thoro's Vice–President, Newman wrote to the Colorado Department of Health after the effective date of Colorado's RCRA program asking the Department to send Thoro the recently published regulations concerning hazardous wastes. Records found at Thoro's Arvada site included correspondence from the EPA and the Colorado Department of Health regarding RCRA regulatory and permitting requirements and an "Overview of the Resource Conservation and Recovery Act." The Overview cautioned that any individuals or companies who disposed of hazardous waste without a permit in violation of RCRA may be subject to significant civil and criminal penalties that are assessed per day of violation.

Given Newman's background, experiences, and training, the jury verdict established that he knew that his failure to remediate or clean-up the spilled and leaked waste could result in criminal penalties. For over a decade after the passage of RCRA, Newman knew about the hazardous and dangerous nature of the toxic chemicals that he spilled and leaked into the ground. As the responsible and knowledgeable officer, he took no action to remediate the polluted soil or prevent dangerous toxins from migrating into underground water and reaching nearby drinking water wells.

## II. The Doctrine of Continuing Offenses in the Context of RCRA

Having explained the background of this case and the RCRA statutory scheme that is designed to prevent the type of underground pollution plume that occurred here, I turn to the question of whether RCRA's definition of "disposal" includes the migration of hazardous waste that is occurring today. I conclude that it does.

The question turns on whether the defendants are guilty of a continuing offense. Such an offense is not complete upon the first act, but instead continues to be perpetuated over time. *See United States v. De La Mata,* 266 F.3d 1275, 1288 (11th Cir.2001); 21 Am.Jur.2d Criminal Law § 513 (2002)("[A] continuing offense is a continuous, unlawful act or series of acts set in motion by a single impulse...."). If the migration of underground pollutants constitutes a "disposal offense" that continues today, then the statute of limitations will not run because the illegal conduct continues. *See* § 16–5–401(4).

As applied in this case, the question becomes: even though the defendants' last "act" occurred in 1985, did they initiate a course of conduct that continues to be perpetuated today? If so, they may be prosecuted civilly and criminally because their offenses are occurring today and thus RCRA's five-year statute of limitations does not operate to bar their prosecutions. To determine whether RCRA recognizes just such a continuing "disposal" offense, I turn to the Supreme Court's continuing offense analysis in *Toussie* and the cases that have applied *Toussie* in the context of RCRA.

In *Toussie,* the Supreme Court held that the defendant's conviction for failing to register for the draft was barred by the applicable statute of limitations. 397 U.S. at 124, 90 S.Ct. 858. Although the government did not indict the defendant until eight years after his eighteenth birthday, it argued that the Universal Military Training and Service Act ("Draft Act") imposed a continuing duty to register until age twenty-six and thus the indictment was timely. The Supreme Court rejected the government's argument. The Court stressed the public policy reasons behind statutes of limitation: to protect individuals against prosecution after the facts have faded away; to minimize the danger of punishment for acts in the distant past; and to encourage government officials to investigate promptly suspected illegal activity. *Id.* at

114–15, 90 S.Ct. 858. Although the Court concluded that criminal statutes of limitation should be construed liberally in favor of repose, it recognized that continuing offenses exist in certain circumstances.

The Court held that in the context of criminal statutes of limitation, there are two instances in which a court can find that a crime qualifies as a continuing offense: (1) when the explicit language of the substantive criminal statute compels such a conclusion; or (2) when the nature of the crime involved is such that Congress must have assuredly intended that it be treated as a continuing one. *Id.* at 115, 90 S.Ct. 858. Applying its two-pronged test to the Draft Act, the Court concluded that there was "no language in this Act that clearly contemplates a prolonged course of conduct." *Id.* at 120, 90 S.Ct. 858. For the second prong, the Court reasoned that there is "nothing inherent in the act of registration itself which makes failure to do so a continuing crime." *Id.* at 122, 90 S.Ct. 858.

Consistent with the guidance set forth by the Court in *Toussie,* numerous federal courts have held that the nature of various offenses is continuous, despite the absence of explicit statutory language that the offenses are "continuing." *United States v. Bailey,* 444 U.S. 394, 413, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)(escaping from federal custody); *United States v. Blizzard,* 27 F.3d 100, 102 (4th Cir.1994)(receiving and concealing stolen government property); *United States v. Garcia,* 854 F.2d 340, 343 (9th Cir.1988); (kidnapping); *United States v. Aliperti,* 867 F.Supp. 142, 147 (E.D.N.Y.1994)(multi-year extortion); *United States v. Field,* 432 F.Supp. 55, 59 (S.D.N.Y.1977)(criminal RICO violation).

The continuing offense analysis in *Toussie* is particularly well-suited for environmental RCRA cases. In such cases, the harm is "inherently unknowable" for long periods of time. Inherently unknowable harms occur when it is unlikely that anyone will discover them before the limitations period expires. *See* Albert C. Lin, *Application of the Continuing Violations Doctrine to Environmen-*

*tal Law,* 23 Ecol. L.Q. 723, 757–58 (1996).[10] Common examples include underground storage tanks that slowly but continually leak hazardous waste into the soil or the continual spread of hazardous waste through underground water systems. *Id.* Such harms are often subtle, gradual events and detection of them requires extensive and complicated sampling. *See* James R. MacAyeal, *The Discovery Rule and the Continuing Violation Doctrine as Exceptions to the Statute of Limitations for Civil Environmental Penalty Claims,* 15 Va. Envtl. L.J. 589, 692 (1996). RCRA violations, that involve the disposal of hazardous waste through underground soil and water, are particularly susceptible to being unknowable harms:

> [M]ajor violations of the Clean Air Act and the Clean Water Act can often be readily detected by the EPA, state environmental agencies, and/or citizen groups because of the mandatory monitoring requirements and because unpermitted releases into the air and water can usually be traced back to the violator. By contrast, violations of RCRA may not be immediately discovered because disposal sites may be operated for many years without noticeable contamination.

Lin, 23 Ecol. L.Q. at 757 (internal citations omitted).

Given the unique nature of RCRA cases, courts have held that the continuing offense doctrine applies to prosecutions of environmental crimes. *See, e.g., United States v. White,* 766 F.Supp. 873, 886–87 (E.D.Wash. 1991); *State v. Brothers,* No. 2001–Ohio–8725, 2001 WL 1602692, at *3 (Ohio App. Dec. 14, 2001)(holding that under Ohio's RCRA statute, barrels leaking hazardous waste into the soil constituted continuing disposal and thus the applicable limitations period had not begun to run).

Indeed, environmental defendants have unsuccessfully relied on the *Toussie* analysis in attempts to escape responsibility for illegally storing or disposing of hazardous waste under RCRA. *See White,* 766 F.Supp. at 886–87; *In the matter of Harmon Elecs., Inc.,*

---

**10.** *See also* Shanley, 10 Pace Envtl. L.Rev. at 276 ("The discovery of improperly stored or disposed of hazardous waste is hampered by the fact that it may take years before such wastes begin to leach into groundwater or aquifers, or present some other identifiable environmental harm.").

No. RCRA–VII–91–H–0037, 1994 WL 730509, 1994 EPA ALJ LEXIS 35 *overruled on other grounds,* 19 F.Supp.2d 988, 998 (W.D.Mo.1998). The *Harmon* case is persuasive because its author is an administrative law judge who specializes in environmental cases. He analyzed RCRA under the *Toussie* framework and concluded that disposing of hazardous waste without a permit is a continuing violation.

Although this RCRA case was a civil and not a criminal prosecution, the judge distinguished *Toussie.* First, the violation in *Toussie* stemmed from the single act of failing to register or provide notification as required by the statute. On the other hand, the RCRA disposal violations resulted from the ongoing operation of a hazardous waste landfill without a permit. The RCRA offense was "not simply an act of failing to file for a permit but a state of continued noncompliance with RCRA by treating, storing, and disposing of hazardous waste without a permit." *Id.* at *32. The ALJ cautioned that when hazardous waste is improperly disposed and remains on the property, it "insidiously affect[s] the soil and groundwater aquifers." *Id.* at *33 (citations omitted). As a result, the violation continues until the appropriate clean-up measures are erected or remediation occurs. *Id.* Consistent with such an interpretation, the statute explicitly provides for per day penalties. *Id.* at *40–41; *see also* 42 U.S.C. § 6928(g)("Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. *Each day of such violation* shall, for purposes of this subsection, constitute a separate violation.")(emphasis added). The ALJ explained that for there to be a daily penalty, there must be a corresponding daily or continuing violation. 1994 WL 730509, 1994 EPA ALJ LEXIS 35, at *41.

Second, the ALJ reviewed the legislative history of RCRA and concluded that Congress intended that unregulated hazardous waste management should be prevented because the consequences of unremediated disposal continue until and unless remediated. *Id.* at *35. Unregulated hazardous waste

disposal practices continue indefinitely and can contaminate drinking water or the food chain and injure the environment. *Id.* (citing H.R.Rep. No. 1491, 94th Cong., 2nd Sess. 3–4, 11, reprinted in 1976 U.S.Code Cong. & Admin. News 6238, 6241, 6249). As a result, Congress mandated the issuances of permits so that such waste will be disposed only in sites designated specifically for that purpose. *Id.*

Concerning the statute of limitations, the ALJ reasoned that it played an important role in the determination of penalties, even when a RCRA violation is continuing. *Id.* at *42–43. He held that the five-year statute of limitations allowed the assessment of penalties only for the five-year period prior to the filing of the RCRA complaint. *Id.* The ALJ concluded that under the *Toussie* analysis, RCRA recognizes a continuing "disposal" violation that is not barred by the statute of limitations.

On appeal, the Environmental Appeals Board ("EAB") affirmed the ALJ and held that consistent with the *Toussie* analysis, RCRA's language imposes "continuing obligations" on those disposing of hazardous waste because of the serious consequences of improper handling procedures. *In re Harmon Elecs. Inc.,* No. RCRA–VII–91–H–0037, 1997 WL 133778, 1997 EPA App. LEXIS 6, at *66 (Envtl. Appeals Bd. March 24, 1997). The EAB concluded that those persons who violate RCRA's permit requirements should not escape the Act's severe, daily sanctions merely because they have continued to violate the law for a considerable amount of time. *Id.* at *67. The application of *Toussie* in the context of RCRA was affirmed by the United States District Court. *See Harmon,* 19 F.Supp.2d at 998, *aff'd,* 191 F.3d 894, 904 (8th Cir.1999).

### III. The Migration of Hazardous Waste Constitutes The Continuing Offense of Disposal under Colorado's RCRA Statute

Based on the framework set forth in *Toussie* and cases such as *Harmon* that apply *Toussie* in the environmental RCRA context, I would hold that RCRA recognizes the continuing offense of disposal to include continuing migration of hazardous waste. The ex-

plicit language of Colorado's RCRA statute compels such a conclusion and the nature of the crime involved is such that the General Assembly, following the guidance of Congress and the broad enforcement provisions of the RCRA statutory scheme, intended that it be treated as a continuing one. *Toussie*, 397 U.S. at 115, 90 S.Ct. 858. Accordingly, even though the defendants' last "act" occurred in 1985, I would hold that they initiated a course of conduct that continues to be perpetuated today and may be punished today.

Thus, I diverge from the majority which holds that a broad and explicit enforcement scheme designed to deter environmental polluters is nonetheless "ambiguous" and rules in favor of the criminal defendants pursuant to the rule of lenity. There is no prohibition against giving statutory words their full meaning in the context in which they are used. *People v. Dist. Court*, 713 P.2d 918, 922 (Colo.1986). The rule of lenity should be used only to resolve statutory ambiguity, and not to create it by disregarding the clear legislative purpose for which the statute was enacted. *People v. Forgey*, 770 P.2d 781, 783 (Colo.1989). A public welfare statute such as Colorado's RCRA statute is designed to protect human health and the environment and should not be construed narrowly. *See United States v. Laughlin*, 768 F.Supp. 957, 965 (N.D.N.Y.1991).

## A. The Explicit Language of Colorado's RCRA Statute Provides for Continuing Disposal Offenses

Contrary to the majority's assertions, there is no requirement under *Toussie* that Colorado's RCRA statute must contain the word "continuing" in order to find that the statute contemplates the punishment of continuing offenses. Instead, *Toussie's* first prong requires examining whether the language in Colorado's RCRA statute contemplates a prolonged course of conduct such as continuing disposal. 397 U.S. at 120, 90 S.Ct. 858. Unlike the Draft Act in *Toussie*, such language is found in the broad definition of disposal and the provision for daily penalties.

RCRA defines "disposal" using a wide variety of terms so as to punish and to deter various types of practices: discharge, deposit, injection, dumping, spilling, leaking or placing of any hazardous waste into or on any land or water. § 25–15–101(3). The definition does not include the terms "passive migration" or even "migrating." However, the term "leaking" reasonably includes migration, either "passive" or "active." A person can actively allow a rusted barrel or storage container to leak. Or, hazardous waste, through no overt action, can "leak through a particular area" such as soil. *See* Webster's Third New International Dictionary 1285, 2195 (1986). Consistent with the interpretation of federal courts in civil RCRA actions, such language does not imply ambiguity.[11] On the contrary, the diversity of meanings of "leaking" and the diversity of terms in general makes it unnecessary to choose between an active or passive interpretation of the term "disposal" because it includes both.[12] Thus, because RCRA's definition of disposal includes not only active

11. The majority also argues that the term "disposal" is ambiguous because courts have concluded that under CERCLA, which utilizes the identical definition, the term does not include passive migration. *See, e.g., Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 879 (holding that migration of contamination through soil is not "disposal" in CERLCA action). CERCLA is not instructive to our analysis of this RCRA case. CERCLA is a vastly different statute that imposes strict civil liability and is designed to clean up or remediate past contamination. RCRA, on the other hand, is prospective only and includes civil and criminal penalties. Under CERCLA, disposal is construed not to include passive migration in large part because it would eliminate the "innocent landowner defense" for those parties who purchased property but did not know or have reason to know at the time that hazardous wastes had been disposed on the property. *See, e.g., Carson Harbor*, 270 F.3d at 882 ("Were we to adopt an interpretation of "disposal" that encompassed all subsoil passive migration, the innocent landowner defense would be essentially eliminated."). The innocent landowner defense is not available in RCRA actions.

12. *Waste Indus. nc.*, 734 F.2d at 164–65; O'Reilly, *RCRA and Superfund: A Practical Guide with Forms* § 2.5 (explaining that the definition of disposal, consistent with the purposes of RCRA, is intended to have a range of meanings, including not only active conduct but passive conduct such as the reposing of hazardous waste and its subsequent movement through the envi-

conduct but passive conduct such as the reposing of hazardous waste and its subsequent movement through the environment that is occurring today, RCRA's language contemplates continuing disposal offenses.

Consistent with a continuing offense, RCRA imposes daily criminal penalties. Criminal defendants convicted of knowingly disposing of hazardous waste without a permit "shall be punished by a fine of not more than fifty thousand dollars for *each day of violation.*" § 25–15–310(3); *see also* § 25–15–310(2)("any person acting with criminal negligence ... shall be punished by a fine of not more than twenty-five thousand dollars *for each day of violation.*")(emphasis added). Unquestionably, RCRA contemplates that for at least some offenses, they are not one-day events. For there to be a daily penalty, there must be a corresponding daily or continuing offense. 1994 WL 730509, 1994 EPA ALJ LEXIS 35, at *41. Thus, unlike the Draft Act in question in *Toussie,* there is explicit language in Colorado's RCRA statute that clearly contemplates a prolonged course of conduct.

**B. The Nature of the Crime of Disposal is Such that the General Assembly Intended It to Include Continuing Migration of Hazardous Waste**

Even if I am wrong that RCRA does not satisfy *Toussie's* first prong because there is no explicit language that disposal is a "continuing offense or violation," it fully satisfies the second prong.

The disposal offense in this case is not simply an act of failing to file for a permit. Rather, the defendants set upon a course of continued noncompliance with RCRA by failing to properly dispose of toxic and dangerous chemicals. Once the defendants leaked and spilled tons of deadly pollutants into the ground, they had a continuing obligation under RCRA to see that the contamination was properly treated, remediated or cleaned up in a manner that no longer posed a threat to human health and the environment. *Harmon Elecs., Inc.,* 1997 WL 133778, 1997 EPA App. LEXIS 6, at *66. The defendants should not escape liability merely because they have failed to handle properly these chemicals for a considerable period of time and told no one of their acts for years. *Id.* at *67.

The prevention of hazardous waste migrating through the environment so as to protect human health is at the core of RCRA's disposal procedures. The "cradle to grave" regime means that owners and operators of facilities that dispose of hazardous waste are responsible for such waste until it is no longer hazardous. RCRA recognizes that when hazardous waste is allowed to migrate dangerously through the environment, those responsible for such migration will be held accountable for their continuing inaction until it stops. The nature of the defendants' actions and inactions—spilling and leaking tons of hazardous waste so that it would continually migrate through the water table unabated—is such that the General Assembly intended that they would be considered a continuing offense.

My construction of the word "disposal" to include migration—based on the explicit language of RCRA and the nature of the crime—does not nullify the public policy reasons behind the five-year statute of limitations nor does it nullify the statute itself. Under *Toussie,* the primary purposes of the statute of limitations in the criminal context were to protect individuals against facts that have faded away, to minimize the danger of punishment for acts in the distant past and to encourage governmental officials to investigate promptly suspected illegal activity. 397 U.S. at 114–15, 90 S.Ct. 858. Such considerations are lessened in the context of continuing and current underground hazardous waste migration. Indeed, government officials will rarely be in a position to investigate or even be aware of an underground pollution plume. In addition, as interpreted by the state in this case, the statute of limitations plays an important role in limiting the time period for which penalties may be assessed. *See, e.g., United States v. WCI Steel, Inc.,* 72 F.Supp.2d 810, 831 (N.D.Ohio 1999)(holding that under RCRA, the five-year statute of limitation limited the assess-

ronment); *Power Eng'g Co.,* 10 F.Supp.2d at 1159.

ment of penalties to five years prior to the filing of the action). As applied in this case and as argued by the state, the state may only seek criminal penalties against the defendants for the five-year time period prior to the filing of the indictment.

Section 25–15–308(4)(b), which prohibits state actions commenced outside the statute of limitations period but allows state remedial orders, does not apply here because the defendants' continuing disposal violation—the continuing leaking of hazardous waste into the water table below—continued at the time of·indictment. This action was commenced within the applicable statute of limitations time period because the defendants' perpetuated a continuing, illegal course of conduct that was present at the time of indictment and is present today.

For example, if the defendants had taken action in 1990 to stop the leaking of hazardous waste from the Thoro facility, then the statute of limitations would have begun to run at that time. Thus, after 1995, the state could not have imposed any penalties—administrative, civil or criminal—on the defendants' disposal violation because their illegal conduct of "leaking hazardous waste" had ceased more than five years earlier. However, under the provisions of section 25–15–308(4)(b), the state could order the defendants, within two years of discovery, to cleanup fully and to remediate the area and any underground water systems affected by their illegal disposal of hazardous waste. § 25–15–308(4)(b).

My interpretation is also consistent with the vast majority of courts that have held that the term "disposal" in civil RCRA actions includes not only when hazardous waste is first deposited into the ground but also when such wastes migrate from their initial disposal location. *See Power Eng'g Co.,* 10 F.Supp.2d at 1159. Given that the definition of "disposal" and the statute of limitations apply equally to civil and criminal actions, I avoid the serious implication of the majority's opinion that civil RCRA actions will now be limited to instances of only "active disposal." Improper disposal practices that result in "passive migration" will no longer be punishable by the Act either civilly or criminally.

Persons responsible for such violations will be less likely to initiate self-regulating compliance programs that will enable them to discover voluntarily, disclose properly, and correct expeditiously any violations before the contamination caused by leaking hazardous waste endangers human health and the environment—contrary to the explicit goals of the Act. Indeed, the majority's narrow interpretation of disposal may also limit the ability of private citizens to enforce the state's hazardous waste program in civil "citizen suits" brought in federal court because of the new ambiguity between the majority's interpretation of "disposal" under state law as compared to the interpretation of the term under federal law. *See Sierra Club v. Chemical Handling Corp.,* No. 91–C–1074, 1993 WL 540377, at *1 (D.Colo.1993)(relying on Colorado's RCRA statutory provisions in private citizen suit).

Because such a narrow interpretation contravenes the broad purposes and enforcement scheme of RCRA and the federal courts that have analyzed the term "disposal" in the civil context, arguably a grave risk exists that the federal government could revoke Colorado's federal financial assistance and RCRA's enforcement authorization because our program is no longer equivalent to and consistent with the federal RCRA program.

Overall, because RCRA's definition of disposal includes migration of hazardous waste, the state can effectively punish environmental defendants who illegally dispose of hazardous waste without a permit and allow it to enter the soil and underground water system. Otherwise, given the nature of most RCRA actions that involve inherently unknowable harms, polluters who illegally dispose of hazardous waste without a permit will likely escape criminal and civil prosecution because the contamination will go undiscovered until well after the statutory limitations period. *See* Lin, 23 Ecol. L.Q. at 757. The state would be limited to prosecuting only those polluters whom they discovered with containers or storage areas that were "actively leaking." *See, e.g., Brothers,* 2001 WL 1602692 at *2. It would seem absurd to prosecute criminally or civilly only those who

had the foresight to contain dangerous hazardous waste that subsequently leaked and not to prosecute polluters who leaked hazardous waste onto the ground without any attempt to clean it up, recover it, treat it or inform authorities of the problem. Such a result is contrary to the language and clear public welfare policies behind the RCRA statutory scheme.

## IV. Conclusion

For the reasons stated above, I would overrule the judgment of the court of appeals and reinstate the defendants' felony convictions for knowingly disposing of hazardous waste without a permit.

I am authorized to say that Chief Justice MULLARKEY and Justice MARTINEZ join in this dissent.